Freeman, J.,
delivered the opinion of the Court.
In 1837, Ephraim Andrews died after making his will, appointing the complainants Mark M. and George Andrews his executors, who proved the will in the County Court of Williamson county, and entered upon their duties as executors.
The second clause of said will is as follows: “I will and desire that all my property, both real and personal, be kept together under the direction and control of my executors, with that of my wife, and that the proceeds of my farm, and the interest of my money, be applied to the maintenance of my ■family, and the schooling and education of my' two ■youngest children, during the lifetime of my beloved wife, and if she dies before my youngest child arrives at full age, my executors are to keep up the farm until that time, and then they, my executors, shall sell and dispose of all the property, both real *238 and personal, that shall remain on hand, at public sale, upon such credits as they shall think proper.”
After giving some small legacies he then proceeds in the fifth clause: “1 will and desire that after the sale of my property as above specified, the money on hand be equally divided amongst all my children, and in the event of the death of any one of them, that their part be given to their children.”
By sixth clause he provides: “that my executors sell such parts of my personal property as will not be necessary to carry on the farm, as above specified.”
■The testator left surviving him, his widow, Ann H. Andrews, and the defendants to this bill, or their ancestors — some of the children having died before the widow, leaving children. The bill is filed in the case by Mark M. Andrews as executor, against the parties above mentioned, the other executor George Andrews, having ceased to act long before upon the settlement of the estate by the executors.
The bill alleges in substance, that the widow was old and infirm at the death of the testator, and was the principal legatee, that she was willed the control of the estate during her life, and that she had died on the 24th of March, 1864, that complainant Mark M., had supported and maintained the family according to the terms of the will, and educated the younger children, carrying on the farm until her death. That the old man, Ephraim Andrews, left a farm, and a number of negroes, which the widow kept on the farm and controlled, under said will, till lost by the *239 war, but that she accumulated no money, expending the income in her own support, and that of her children who stayed with her.
It further charged, that Ann H., the widow, in her life time made advancements to some of her children of the use of negroes, and other property, with which they are chargeable in settlement.
The bill also alleges, that under the provisions of the will, complainant had sold the land in three parcels, one purchased by James S. Shumate, who had married one of the parties entitled under the will, one other by George Andrews, his co-executor under the will, and the third by John T. Andrews, another party entitled under the will to a portion of the proceeds of sale.
The bill then charges that Brokenborough Andrews one of the sons of Ephraim Andrews the testator was indebted to the estate $350, due by note, which was reported in the settlement of the executors as paid, and assumed by the complainant, said note due December, 1836, and that complainant had held the note since his settlement as a charge on Brokenborough’s share of the estate. He claims that he is entitled to retain the amount of this note out of the interest of said Brokenborough in the estate.
It is also charged, that Ann H., the widow of Ephraim, was the owner of some slaves in her own right, and at her death had appointed complainant her executor, but the slaves being lost, the estate is insolvent, which had been suggested in the proper court.
He then alleges that, under the will of Ephraim, *240 the debts created by the widow in carrying on the farm, and in supporting herself and family, are a charge on the Ephraim Andrews estate, concluding with a prayer that the court will declare the proper construction of the will of Ephraim Andrews and the duties of complainant as executor, and the rights of parties under the provisions of said will — asks a discovery of advancements, and that they be charged to parties receiving them on the account to be taken in the cause — that he be allowed to retain the $350 out of Bro k en b or ough’s interest, and that the estate of Ephraim Andrews be transferred to the Chancery Court for settlement and for general relief.
The defendants, children of Brokenborough, answer and insist that the note is barred by time, and has in fact been paid, and could only be enforced against his administrator, if at all. An administrator was afterwards brought before the court who relied on the same defenses as were contained in the answer of the heirs. Without giving details of the answers of all the defendants, it suffices to state that the children of Brokenborough introduce the statement into their answer, after denying that Ann H., the widow, was principal legatee under the will of Ephraim, that there had been two bills filed before this, in one of which a decree had been pronounced in 1849, and in the other in 1857, in both of which the interest of Ann H. was incidentally stated as being a life estate. In the first case they claim they were not parties, their father being then alive and made a party as a non-resident by publication, and that he, as it turns *241 out, had no interest in the controversy, having died before Ann H., the widow, and therefore took nothing under the will. In the other case they were made parties as non-residents, but they insist that they were minors, and say that they were not represented before the Court by guardian. They further insist that the question, whether the widow took a life estate or less, was not presented in the pleadings in these cases, and was passed on by the Court without special attention, and thereupon they ask for a re-examination of the question and a different construction of the will. They also state, in support of this view as to the proper construction of the clause of the will, that the said Ann H. was possessed of a number of slaves, which explains the meaning of that clause in which the testator says he wishes his “property, both real and personal, to be kept on the farm under the control of his executors with that of his wife,” and that he did not intend to give her joint control of his property with his executors; and we may here remark that the fact is shown to have been as stated, and consequently this is the true idea of the will so far as the control of the widow of the testator is concerned.
It is further shown that in October, 1849, in the compromise decree made in the first ease, complainant and George Andrews resigned in open court their position as trustees, and S. H. Andrews and Ann H., the widow, were appointed trustees in their stead, in which decree, it was ascertained that about $1,200 were due Mark M., and notes of the new trustees given *242 him for the same, charged on the trust property, and which have been, we believe, paid out of its proceeds by said trustees. The defendants insist that Mark M. had exclusive control of the farm and property for about twelve years, up to his resignation in October, 1849, and made large profits out of it, and grossly mismanaged it,. all for his own advantage, and seek to go behind the decrees in the two cases mentioned, in order to avoid the claim of the sum found due Mark M. by the decree, and to charge him generally for profits made out of the trust property.
These two cases, and the decrees made in them, raise the first question presented for our decision in this case. On looking at the decree in the first case, October, 1849, we find that it was a compromise decree, and as we construe it, that it does not purport to settle the proper construction of the will of Ephraim Andrews, deceased, although incidentally it calls the estate of Ann H. a life estate, and charges the amount agreed to be due Mark M. on that life interest in the trust fund, or property left under control of executors, by the will of Ephraim. It does settle the amount due Mark M. Andrews from the estate, and as such binds all parties to it, prima facie at any rate, precluding any account behind it of management of the estate.
It is insisted, however, that the children of Brok-enborough Andrews, and perhaps others, are not bound by the decree, because they were not parties to it, but only their father, who had a contingent interest — that is, the property or share in the balance remaining at the *243 death of the widow Ann H. was given to him, but if he died before her death, then to his children surviving him, and as he died before his mother, it turns out he did not get the property at all.
On this question first we remark, that the devise to the executors did not vest them with the legal title, but only with the control' and management of the property charged with the duties of the trust specified in the will. The legal title to the land descended to the heirs of said Ephraim, subject however to the trusts and charges contained in the various clauses of the will.
By the second clause of the will, it will be seen that during the lifetime of the wife Ann H., the proceeds were to be used in the support and maintenance of his family and the education of the children, and it is manifest that the testator supposed that the charge thus made would absorb the proceeds or profits of the property, as he makes no disposition of any surplus, should there be any, and that by the fifth clause he only provides for the equal division of the money on hand arising from such sale, and that it shall be divided among all his children, and that in the event of the death of any of them, “their part be given to their children.” This was a gift to his children equally of the proceeds, which goes to their children should either one of his children die, the grandchildren taking “their part,” that is, the part of such dead child.
The children, however, who constituted part of the family, or what constituted his family — his widow, and *244 such children as were with her as such — were the only objects of his bounty, during the life of Ann H., the widow; the grandchildren, as such, had no right to call on the executors either in that character, or as trustees for profits of the estate, as they had an interest only in the proceeds of the sale of such property as remained on hand at the death of Ann H., as the case has turned out, she living till all her children came of age.
In this view of the case, it might be very questionable as to whether even their father Brokenbor-ough Andrews, he not being a part of the testator’s family, as contemplated by him in his will, had any right to call on the executors to account for profits during the life of Ann H., as only those constituting the family were entitled to these profits. See Harris v. Alderson, et. als., 4 Sneed, 255, 256; 2 Head, 548. This being so, they have no right'- to look to, or reopen the accounts as to profits in which they had no interest.
It is probable they would be concluded by this decree as to this account on another principle; that is that their father, Brokenborough, was before the Court, and as such, having the first estate — having the legal title in the land, and his children only taking such share as he received in the event of his dying before Ann H., he would be held virtually in the language of Mr. Story Eq. PL, s. 147, to have represented this contingent interest, and his children would be bound by the decree, as to profits and all matters involved in the decree of October, 1849. See also Story *245 Eq. Pl., s. 144, 145, 146, 147. Besides, as far as we • can see, these settlements of Mark M. and his co-executor were made more than twenty years before filing this bill, and seem to have been passed on by the County Court, and ultimately, after warm litigation, to have been settled and agreed on by parties interested at the time in the decree of October, 1849, and they ought not be re-opened lightly under the circumstances. In addition, while the principle applicable to a family compromise may not be strictly applicable as to the children, if they had any real interest in the matters settled by the decree, yet it should have a material influence in the action of a court, when such things, no fraud appearing, are sought to be uprooted after great lapse of time. We therefore hold, that as to all matters of account involved and decided in the decree of 1849, no further investigation can be had in this case.
Next, as to the second decree in 1857, we need but say, that so far as it settles any thing in reference to an account previous to the decree of 1849, it need not be discussed, as the view we have taken of the rights of the parties in the profits or products of the property would preclude any necessity for inquiry on that subject. To this bill however the children of Brokenborough Andrews were parties by publication, or as alleged in their answer in this case, as non-residents, and are bound by the legal effect of said decree, other things out of the way, on the plain principle that in a collateral proceeding, or when brought collaterally in question, the *246 decrees and judgment of a court of general jurisdiction cannot be attacked for mere irregularities, even if they were shown to exist, but must be held binding, when the court had jurisdiction, unless void on their face. In addition, the regularity of all formal parts of the proceeding would be presumed in favor of the proper performance of their duty on the part of such courts: 6 Hum., 444; Thacher v. Chambers, 5 Hum., 313, 4 Yer. 166.
It is insisted however, that these parties were minors at the time of this proceeding and decree, and this is probably true, but a fact, even that of minority, cannot be shown dehors the record, to show the invalidity of a decree or judgment of a court of competent jurisdiction. The parties had their remedy by direct proceeding, by bill filed to set aside the decree, or by writ of error oorarn nobis, or by bill in the nature of a bill of review, but they can not in this way, by answer, defeat the effect of the decree.
This second bill was mainly filed as a bill of review, ,or bill in the nature of a bill of review, to review and set aside the former decree of 1849, and to have the accounts then taken reopened, which was, on hearing, refused by the chancellor, and this action is binding on all the parties to it, as we have said. The son of Ephraim Andrews, S. H. Andrews, was made a party to this bill, but he died, and thereby his interest under the will terminated. The case was revived against his executor, not against his heirs. They then were not affected by this decree, as their father could not represent them, his particular con *247 tingent estate Raving determined by his death. But as we hold that the former decree in 1849 was conclusive as to the account and all matters involved in it, on that question, and Mark M., and George T. Andrews having resigned in open court as the trustees, in that decree, and S. H. Andrews and Ann II., the widow, having been appointed in their stead, no account can be had against them as trustees, at any rate after that time. In addition to this, as we have before intonated, these grandchildren had no interest- in any thing but the proceeds of what property remained on hand, after the death of Ann H. They had none • in the profits during her life; after her death, however, all the parties in interest, are entitled to a strict account of the property on hand which was left by Ephraim Andrews, or the offspring of such property, as in case of slaves and of stock, and such an account can be had, either against the estate of S. H. Andrews or of Ann H., should it be claimed that either destroyed or made way with such property, not its simple profits. If Mark M., has taken charge of this property, or any of it, after the death of Ann H., he is liable for it, or its proceeds.
The next question presented is, as to the effect of the resignation of Mark M., and George T., in 1849, as trustees, and whether Mark M., had the power, as sole acting surviving executor, after such resignation as trustee, to make a valid sale of the land, the validity of such sale being submitted for the decision of the court in the answer, by the purchasers thereof.
There can be no question but that Mark M. and *248 George T. Andrews, occupied the twofold relation to the estate of Ephraim Andrews, of executors and trustees, in reference to the control and management of the property, and were charged by the will, as executors, with the collection of the assets, and payment of the debts and legacies, so far as the personal assets would go; but as trustees, they acted under a power specially given in the will, to manage and control the estate, for purposes therein specified, and then at the end of the life estate of Ann H. to sell what remained, and divide it equally among the children of the testator, and if any were dead at the death of the widow, then their shares to go to their children. See case of Hughlett v. Hughlett et als., 5 Hum., 467.
In the case of Drane v. Bayliss, 1 Hum., 187, the will of the testator provided that, “my executor keep all my property of every description together on my plantation, for the support of my wife and children, except such as he may deem sufficient to pay my just debts and funeral expenses. And it is my will that my executor divide my property as near equal between my wife and ten children, (naming them) at the time my youngest child comes of age.” He was charged with other duties during the minority of the children, and then authorized to divide the lands or sell them, so that they might be equally divided among the children. He then appointed John Shelby guardian of his children till twenty-one years of age, and also sole executor of his will. The Court say in this case: “It needs but to look at this will to be satisfied that, except as to the sale of so much of *249 the property as would pay the debts and funeral expenses, the powers of Shelby were as guardian and trustee.” The case before us can not be distinguished in its facts or principles from the one above cited, and it must be governed by the rule there laid down. The Court say, in this case, that in the event of the death of the trustee, a court of chancery would be the proper tribunal, and not a court of probate, to appoint a proper person to carry into effect the trusts of the will: p. 188, and so in this case, the duties of the executors had long since been discharged by the collection of the assets, and the payment of the debts, and these accounts had been settled and the settlements confirmed, we believe in 1839. From that time forward they acted as trustees till their resignation in 1849, and then the Court of Chancery properly appointed trustees to execute the trusts of the will, both of whom however are dead. No new trustees however need now be appointed, as all the "parties in whom the legal estate was are before the Court, and the Court could well proceed to execute the trusts, without the formality of appointing new ones instead of Seth H. and Ann H. Andrews.
It follows from this that Mark M. had no more power or authority to sell the lands than any other person, his contract being operative on himself by way of estoppel as to his own interest in them, but no further. The sale of the lands can not be enforced then in this view of the case, and as its validity is submitted for the decision of the Court, we are compelled to hold it void, as without authority, *250 and consequently communicating no title to the purchasers.
It is insisted, however, that as it is shown that the sale is manifestly to the interest of all the other parties, not purchasers, the land having fallen in value since the sale up to the time the proof was taken, this Court can, and ought to, enforce it now for the benefit of the minors.
We do not think we can, on sound principles, do this, even under the several cases of judicial sales where a doctrine somewhat of this kind seems to have been held. The case of Swan v. Newman, 3 Head, 290, is, we believe, the leading case reported in our books on that question. On looking into that case, it will be seen that no decision of the question was actually made, as the facts did not call for it; as the sale was held to have been regular, and the title of the purchasers good, and the most that was complained of was, that the proceedings were irregular in such respects as would not have rendered it' void, and the Court might well say that for the protection of infants, when the sale was not void but only irregular, on bill filed to set it aside, and the interest of the infants clear that it should not be done, all the parties being then before the Court, they could then give him a good title, and this was all he could ask. However, to say the least of it, it is a considerable strain on established principles to hold whore a bill is filed to set aside a sale as being void, or conveying no title, that under the pleadings appropriate to such proceedings, a court can institute *251 an investigation as to what is the interest of defendants, and upon that interest being shown by the proof, and the question not raised by the allegations of a bill or cross-bill, the court shall decree a divestiture of title, and go on to perfect the title of the purchaser. We are not disposed to carry the principle any further than aboye indicated.
In this case, to enforce the sale made by Mark M. Andrews would be not to decide what is submitted to the Court — that is the question of the validity of the sale— but to say, that as a sale had been made before the suit was brought, which the Court thinks was a good one notwithstanding it was void, the Court will now adopt it and make it a sale, because it may be for the interest of other parties so to do. In other words, to make a contract, not to decide upon the validity of one.
As to the question of advancements to children and grandchildren during the lifetime of Ann H., if any of them received any of the property and retained it after the death of Ann H., the widow, they can be charged with value of said property at her death. But no account can be had of profits during her life, as they were given for the support and maintenance of the family, as such, during her life, and if she chose to let any of her children have such profits, she had a right so to use them.
As to the $330 claimed by Mark M., from the estate of Brokenborough Andrews, we think the Chancellor properly disallowed the claim, and affirm his decree. The presumption arising from time of payment had *252 attached before filing of the bill, and besides, we suspect it had been long since paid.
As to the debts contracted by the widow during her life, they can in no aspect of the case be allowed as a charge on the property of Ephraim Andrews’s estate, but are solely her debts, to be paid out of any property she may have left, in regular course of administration. Mark M. Andrews will be taxed individually with all costs caused by having brought her estate into this litigation.
We have thus gone through with the questions presented in this complicated record, the result of which is, that the decree of the Chancellor will be modified in accordance with this opinion, and the ease remanded to the Chancery Court, for the purpose of taking the proper accounts as indicated in this opinion, where on supplemental pleadings, the Chancellor can decree the sale of the lands, and other property that may be found to have remained of the estate of Ephraim Andrews, at the death of Ann H. Andrews, and can take a proper account to ascertain what other property remained besides the land, or hold parties • who may have taken possession of said property responsible for the same, and make a proper distribution of the proceeds under the second and fifth clauses of the will of said Ephraim.
Mark M. Andrews will pay all the costs of his claim on the $330 note against the estate of Broken-borough Andrews in the Court below and in this Court, and one-half of all the other costs of the Court below, and of this Court, the other appellants will pay *253 the balance of costs of this Court. The balance of the costs of the Court below will be paid out of the funds in litigation.