## PULLIAM *v.* PULLIAM, Ex'r, and others.

*(Circuit Court, W. D. Tennessee. April 26, 1879.)*

1. EXECUTOR—ACCOUNT AGAINST, BY LEGATEE.

    An account against an executor in behalf of a legatee is a matter of course in a court of equity.

2. SAME—STATUTE OF LIMITATIONS NOT A BAR TO REMEDY—RIGHTS NOT BARRED BY LAPSE OF TIME.

    The executor being an express trustee, the statutes of limitations do not bar the remedy. Lapse of time, under certain circumstances, does bar the remedy. But where an executor qualified December 6, 1865, and made no settlement until July 19 ,1872, because the assets were not collected and the estate not ready for settlement before that time, a bill filed July 7, 1876, was within the strictest rule as to lapse of time, considering the rights of the plaintiff under the will.

3. EQUITY JURISDICTION OF FEDERAL COURTS—NOT AFFECTED BY SETTLEMENTS IN STATE COURTS.

    A state statute enacting that settlements made in the county court "shall be *prima facie* evidence in favor of the accounting party," cannot operate to restrict the plenary jurisdiction of the federal courts of equity to enforce the trusts of a will at the suit of a legatee. Those courts will not assume the general administration of the estate, but will require the executor to account *de novo* for the purpose of ascertaining the share due the legatee.

4. POWER OF COURT OVER SETTLED ACCOUNTS—EFFECT OF WANT OF NOTICE OF SETTLEMENTS.

    If such a settlement be pleaded as a settled account, the court may, irrespective of any statute, order it to be so taken and to stand before the master as *prima facie* evidence. But this is never done unless it appears that the legatee had notice of the making of the settlement.

5. PRODUCTION AND PROOF OF ACCOUNTS IN FEDERAL COURTS—EQUITY RULE 79.

The old mode of proving the account, item by item, has been abolished by equity rule No. 79. If the executor sets up a settlement in the county courts by his answer, and proves it by his deposition, the court will order the master to treat it as presented under that rule.

6. REQUEST FOR DELAY TO SAVE THE BAR OF THE STATUTES MUST BE SPECIFIC AND TO A PERIOD CERTAIN—WHEN INSUFFICIENT.

A request by the executor for delay, to save the bar of the statute of limitations of two years and six months in favor of dead men's estates, must be for a definite length of time, agreed on by the parties, or fixed by reference to some designated event which may occur, and thereby render the period certain. A request in writing, made in the following words: "I request that you do not enforce your claims of all descriptions against the estate of John N. Pulliam, by suit or legal proceedings, as the assets of the estate are not yet collected by me sufficient to pay the debts due and owing by John N. Pulliam. By your delaying to sue it shall not prejudice your claims, as I will not avail myself of the statute of limitations applicable to executors, administrators," etc.,—*held* to be insufficient.

7. WILL—RIGHTS OF CREDITORS.

A testator cannot, by directing the order of appropriation of the assets, defeat the rights of creditors.

8. SAME—EXONERATION OF LEGACY—EXECUTOR AS TRUSTEE—WHEN CHARGED PERSONALLY.

But a testator may exonerate a legacy by charging the debts upon other property in a way that will make the executor a trustee to execute the will, and charge him personally, if he so disregards the directions of the will as to injure the legatee.

9. SAME—DUTY OF EXECUTOR AS TRUSTEE—AS TO PROPERTY IN OTHER STATE— TITLE TO TRUST PROPERTY—LIABILITY TO LEGATEE FOR VALUE OF PROPERTY NOT ADMINISTERED.

Where a testator directed his debts to be paid out of his other property, real and personal, in exoneration of a legacy to his wife, granting the necessary powers of sale to his executor, he must execute the trust fully; and if real property be situated in another state, he must execute the will there by doing whatever is necessary for that purpose, if he qualifies in the state of the domicile of the testator. An executor so qualifying has the title of the trust property wherever situated, and he cannot separate the trusts and examine the will in one state, leaving out the others. He becomes personally liable to the legatee if he so executes the trust as to injure her by taking her legacy to pay debts that might have been otherwise paid if he had carried out the will in all its parts. He will be charged in this account with the value of the property not administered as if he had sold it and realized the money.

10. SAME—LIABILITY OF EXECUTOR IN STATE OF TESTATOR'S DOMICILE—FEDERAL RULE OF EQUITY DECISION AS TO PROPERTY IN OTHER JURISDICTION —UNAFFECTED BY LOCAL STATUTES AND DECISIONS.

The principle that an executor in the state of testator's domicile becomes, under a will making him testamentary trustee, charged with the trusts of the will, is one of general equity decision, and is wholly unaffected by state statutes and decisions, limiting his liability as *executor* in the state courts in relation to property in another jurisdiction. These local laws may restrict his

powers and limit his liability *qua* executor in that state, but do not affect the equity powers of the federal courts over him as a trustee. The rule is the same in the equity courts of the state of Tennessee.

11. SAME—EXTENT OF LIABILITY OF EXECUTOR AS TRUSTEE.

But an executor neglecting to execute the trusts of a will is not absolutely liable for the legacy to the injured legatee, but only to the extent of what he actually receives, and this will be reached by charging him as if he had sold the property at proper time and received its value, unless there has been supine negligence to charge him further.

12. DEED OF GIFT—DELIVERY, HOW PROVED—HANDWRITING OF DECEASED SUBSCRIBING WITNESS, HOW PROVED.

If a subscribing witness be dead, his handwriting cannot be proved by another subscribing witness, seven years after death of grantor, to establish *delivery* of the deed so as to set it up against a will charging the land with the debts.

13. EVIDENCE—DECLARATIONS OF HUSBAND NOT TO CHARGE WIFE—ACQUIESCENCE BY DURESS.

The declarations of a husband that he had buried a large quantity of gold coin in a place known only to his wife and her brother, do not prove that she appropriated the coin to her own use. The relation of husband and wife will often secure, by duress, acquiescence in the false statements of each other. A cross-bill after his death, by his heirs, will not be sustained on such declarations to charge her with the treasure.

In Equity.

*Wright & Folkes*, for complainant.

*Vance & Anderson, Harris, McKissick & Turley, H. C. Moorman*, and *Calvin C. Harris*, for defendants.

HAMMOND, D. J. This is a bill by the widow of John N. Pulliam, against the executor and the legatees and devisees, for a general account of the administration of the estate, to recover certain legacies and devises made to her, and to charge the executor with certain alleged breaches of his trust.

J. N. Pulliam died in Fayette county, Tennessee, October 20, 1865, leaving a will, in which he gave his wife one section of his lands in Arkansas, "she making her own selection," all the money he might have on hand in her possession at the time of his death, she not being required to give his executors any account of the same, certain specified articles of personal property of which she was to be put into possession at the time of his death, together with all the notes he received of her at her marriage. The will also provided, among other things, that the executors should, after payment of these legacies, pay all the testator's just debts out of the remainder of his estate, the balance of the estate to be equally divided among all his children; and his sons Joel L., John J., and Alfred B. Pulliam were named as executors. The will is dated February 23, 1863. The defendant J. J. Pulliam alone qualified as executor, and only in Tennessee, the other

sons having declined. He took the oath required by the statute, and received letters testamentary on the sixth of December, 1865, filed his inventory on the nineteenth of January, 1866, and his first and final settlement on the nineteenth day of July, 1872.

A decree for an account is a matter of course, and upon the single charge that an executor has proved the will may be founded every inquiry necessary to ascertain the amount of the estate, its value and the disposition. made of it, the situation of any part remaining undisposed of, the debts of the testator, and any other circumstances leading to the account required. Desty, Fed. Proced. Eq. rule 73 and note, p. 303; Williams, Ex'rs, 1732; 2 Daniell, Ch. Pr. (4th Ed.) 857; Gresley, Eq. Ev. 168; *Law* v. *Hunter*, 1 Russ. 100; *Walker* v. *Woodward*, Id. 110. And these authorities show that, as to the details of the account, it is improper to introduce proof, except such as may be necessary to settle the principles which are to govern the master, until the cause is before him for that purpose.

In thus proceeding against an executor a court of equity treats him as a trustee for the legatees and devisees to execute the trusts of the will. Williams, Ex'rs, 1717. He is an express trustee, and the statutes of limitation do not bar the remedy. *Lafferty* v. *Turley*, 3 Sneed, 157; *Carr* v. *Lowe*, 7 Heisk. 85; *Decouche* v. *Savetier*, 3 Johns. Ch. 190, 215, 222; *Wallis* v. *Cowell*, 3 Ired. L. 323; *Taylor* v. *Benham*, 5 How. 233, 276. Lapse of time, however, as in all other cases in equity, will, under certain circumstances, operate as a bar. *Lupton* v. *Janney*, 13 Pet. 381; *Burton* v. *Dickinson*, 3 Yerg. 112; *Piatt* v. *Vattier*, 9 Pet. 416; *McKnight* v. *Taylor*, 1 How. 161; *Maxwell* v. *Kennedy*, 8 How. 210; *Boone* v. *Chiles*, 10 Pet. 177.

The common-law presumption of payment after 20 years furnishes the analogy most frequently applied: this has been reduced to 16 years in Tennessee. *Blackburn* v. *Squib*, Peck, 60; *Thompson* v. *Thompson*, 2 Head. 404. But in *Lafferty* v. *Turley, supra,* 27 years was held not to defeat the right to an account in a case like this. In *Burton* v. *Dickinson, supra,* at the stating of the account between the parties those interested were present, received their shares of the property, and executed receipts; and 12 years were, therefore, held to be a bar. So, in *Lupton* v. *Janney, supra,* there being no charge in the bill of any fraud against the executor, it was dismissed, not having been filed until 12 years after the final settlement in the orphan's court. Here the executor made his first and only settlement on July 19, 1872, and this bill was filed July 7, 1876, less than four years after; so that, if we adopt Mr. Justice Story's *dictum* as announced

in *Lupton* v. *Janncy*, that the bill must be filed, at furthest, within the period proscribed by the statute of limitations for actions at law upon matters of account, (though I do not see why this is not an abrogation of the rule that the statute of limitations does not apply to express trustees,) this bill comes within our statute of six years, and is filed in time.

It is true, the plaintiff could have filed this bill at any time after the expiration of the two years allowed the executor by law to settle the estate, (Tenn. Code, § 2311,) and she might possibly have maintained a bill for an account at any time after the six months allowed to ascertain the condition of the estate, (Code, § 2274;) but, considering her rights under this will, she might well delay any demand for an account until the executor had collected the assets and paid the debts, presuming that he would do his duty; and certainly he had no right to require that she should ask for a settlement in a court of equity before he himself considered the estate ready for settlement in a court where, by law, he was bound to settle.

There can be no doubt, therefore, that the plaintiff here is entitled to an account; and our only duty now is to determine, so far as we can, the extent to which it shall go, and the principles that shall guide the master in stating it. *Field* v. *Holland*, 6 Cranch, 8; *Dubourg* v. *U. S.* 7 Pet. 625.

And, *first*, what effect is to be given to the settlement made by the executor with the county court of Fáyette county on July 19, 1872, and which was examined and approved by that court at its October term, 1872? It does not appear whether the notice required by section 2298 of the Tennessee Code of the making of this settlement was ever given. The settlement of accounts by executors and administrators is regulated in detail by statute, including a requirement for notice to the parties interested; and section 2305 provides that a settlement, when so made and recorded, shall be *prima facie* evidence in favor of the accounting party. Code, §§ 2295, 2305, and note. The defendant insists that the plaintiff must successfully attack the account by showing errors in it, and only to the extent that she surcharges and falsifies it by such errors can he be required to account again; that this settlement has the verity of a judicial record, and must be here so considered. There is no question but that it has this effect in the state courts wherever the settlement is called in question. This statute is not a mere rule of evidence, but a declaration of the force and effect of the judicial decree in the county court approving the settlement. *Snodgrass* v. *Snodgrass*, 1 Bax. 161; *Milly*

v. *Harrison,* 7 Cold. 213; *Curd* v. *Bonner,* 4 Cold. 632; *Elrod* v. *Lancaster,* 2 Head, 571; *Turney* v. *Williams,* 7 Yerg. 172; *Burton* v. *Dickinson,* 3 Yerg. 112.

Has the general rule of equity jurisprudence, that a legatee or devisee is entitled as a matter of course to an account against an executor on a bill filed for that purpose, been changed by the statute? The jurisdiction does not depend upon the right of a court of equity to surcharge and falsify accounts between individuals for fraud or mistake, or to open settled and stated accounts on like grounds of equitable relief, but attaches from other sources; that is to say, it has been acquired by the assumption on the part of courts of equity of jurisdiction over the assets of deceased persons, and the accounts when taken are mere incidents to the relief. Beyond this it has plenary jurisdiction over these matters which no other court has to administer the trusts of the will. Story, Eq. Jur. § 530 *et seq;* Toller, Ex'rs, 479, § 4. The jurisdiction of the ordinary to take an account, under the English statutes in force at the time our federal courts were organized, was very much restricted, and out of these restrictions has grown the necessity for equitable relief. Toller, Ex'rs, 489, § 5. I cannot find that in administering this relief courts of equity paid any attention to settlements made in the ecclesiastical court, as such; indeed, I doubt if such settlements as are made in our probate courts under statutes conferring upon them more or less extended jurisdiction, were known to any court at that time other than a court of equity. In case a legatee *elected* to go into the spiritual court the executor was obliged to exhibit an inventory and bring in an account. All legatees and parties interested were cited to appear at the making of the account, for it was not conclusive on such as were absent and had not been cited. Id. 491, 495. After the ordinary had investigated the account, if true and perfect, he pronounced for its validity, and in case all parties interested had been cited such sentence was final, and the executor was subject to no further suit. Id. 495. But the jurisdiction of the ordinary was very limited, and the conclusive nature of the account so made before him applied only to matters within that jurisdiction.

Can this principle be applied to settlements made in our probate courts, so widely differing in their powers and jurisdiction in the several states, to limit and confine the remedial powers of a federal court of equity? It seems to be settled by the Tennessee cases, above cited, that this statute was passed for the very purpose of imposing such a limitation on the state courts. But the jurisdiction of the

federal equity courts cannot be thus controlled by state legislation. In *Mallett* v. *Dexter*, 1 Curtis, 178, Mr. Justice Curtis treated such a settlement conclusive, on the ground that the state court having first acquired jurisdiction, its adjudication was final and precluded the concurrent jurisdiction of the federal court; and the same doctrine was followed in *Haines* v. *Carpenter*, 1 Woods, 262. In the latter case it is said that the administration of the estate cannot be, by such a bill, transferred to the federal court, but that its jurisdiction is complete by a full account to ascertain at the suit of a distributee just what his share is. In *Lupton* v. *Janney*, 13 Pet. 381, Mr. Justice Story says that such settlements, even when made *ex parte*, are *prima facie*, and can only be opened on a bill to surcharge and falsify; but he especially declines to decide whether the jurisdiction of the orphans' court was *exclusive*, and takes care to place his judgment wholly on the ground of lapse of time as a bar. In *Barney* v. *Saunders*, 16 How. 535, it was held that settlements in the orphans' court could not be *collaterally* attacked, although the trusts under the same will were inquired into. It seems there were two executors; one became administrator *de bonis non*, with the will annexed, and collected *assets*, which he turned over to himself and the co-executor as *trustees*. The court *seems* to treat the jurisdiction of the orphans' court over the *administration* account as conclusive, and its settlement final. In *Beatty* v. *Maryland*, 7 Cranch, 281, such a settlement was held not to be evidence, either *prima facie* or otherwise, in a suit at law on the administration bond upon an issue of *devastavit*. Whatever may be found in any of these cases to support the argument that this statute is binding on this court to the extent that the settlement in the county court should be treated as an adjudication in favor of the executor that his disbursements have been proper and his administration lawful, is modified by subsequent cases. It has been repeatedly held that the federal jurisdiction cannot be impaired by the laws of the states which prescribe the modes of redress in their courts. If legal remedies are sometimes modified to suit the changes in the laws of the states and the practice of their courts, it is not so with equitable. The equity jurisdiction conferred on the federal courts is the same that the high court of chancery in England possesses, is subject to neither limitation nor restriction by state legislation, and is uniform throughout the different states of the Union. Nor are we confined to the rules of relief prescribed for the equity courts of the state. It is no more competent for this statute to say to this court that the action of the county court shall be

*prima facie* conclusive, and thus defeat our jurisdiction *pro tanto*, than it would be to say that it should be absolutely conclusive and thus defeat the jurisdiction altogether. *Payne* v. *Hook*, 7 Wall. 425; *Union Bank of Tennessee* v. *Jolly*, 18 How. 503; *Suydam* v. *Broadnax*, 14 Pet. 67; *Yonley* v. *Lavender*, 21 Wall. 283; *Railway Co.* v. *Whitton*, 13 Wall. 270, 285; *Hyde* v. *Stone*, 20 How. 170; *Gaines* v. *Fuentes*, 92 U. S. 10; *Tate* v. *Norton*, 94 U. S. 747; *Carter* v. *Treadwell*, 3 Story, 25, 51.

But while this is true it does not follow that this settlement is to have no effect whatever in taking the account to which the plaintiff is entitled. Irrespective of this statute there is abundant authority for the position that before the master it may be treated, *so far as the court by the decree of reference shall adjudge,* as evidence against the executor to the extent that it contains admissions by him, and in his favor to the extent that it is not shown to be incorrect. There is great conflict of authority as to the exact weight to be given to it, but it is rather a matter of practice in taking the account than a rule of evidence. The earlier cases in Tennessee give such settlements no effect at all. *Greenlee* v. *Hays*, 1 Tenn. 300; *Bashow* v. *Blackmore*, Id. 348; *Stephenson* v. *Yandel*, 5 Hayw. 261, (Cooper's note;) *Stephenson* v. *Stephenson*, 3 Hayw. 123. The cases since the statute of 1822, above referred to, (Code, § 2305,) have heretofore been noticed. In *Newton* v. *Poole*, 12 Leigh. 112, 142, it is said that it has long been the rule of our courts to treat these settlements in the probate courts as *prima facie* evidence, and it rests mainly upon the established practice of the country, and a presumption that the accounting officers have done their duty. And see *Nimms* v. *Com.* 4 Hen. & Munf. 57; *McCall* v. *Peachy*, 3 Munf. 388, where it is said the executor will not be required to produce here the vouchers he has filed in the county court but may use copies of them. In *Wood* v. *Barrington*, 1 Dev. Eq. 67, it is said that a settlement by the county court is no way binding on the next of kin. It may and possibly should have some weight in taking the account, particularly where the executor is dead. It is not a stated account. It is possible that the case of *Lupton* v. *Janney*, 13 Pet. 381, which holds that such an account is *prima facie* evidence, and even our state statute, was intended to go no further than give it the weight which these authorities would seem to authorize without the statute; but the adjudications have extended the operation of the statute further than this, and invested the settlement with the verity of a judicial record. And it is this construction, so much relied on here by the defendant, that trenches

on the jurisdiction of the court. In England the defendant would have been required to set up this account as a *settled* account, whereupon the chancellor would or would not, according to circumstances, treat it as such and so direct the master, who took no notice of it unless the decree so directed, and only so far as he was directed. Where the decree gave it the force of a settled account, it was usual to direct that it should stand *prima facie* conclusive, with liberty to the other party to show any error therein. 2 Daniell, Ch. Pr. (4th Ed.) 1253. In *Everstone* v. *Tappan*, 5 Johns. Ch. 497, Chancellor Kent ordered an *extrajudicial* account, taken where the parties had notice and were present in a court without jurisdiction, to stand as a settled account, proving itself, except where error was shown.

Under the facts and circumstances of this case, I would not order this account to stand before the master as a settled account, for the reason that it is not shown that the plaintiff had notice, which was always essential. But the old mode of taking accounts before the master, by tediously proving every item, has been abrogated, and the sixty-first rule of the English chancery practice, adopted in 1828, requires the accounting party to state his account in the form of debit and credit, which, being verified by the affidavit of the party, stands as a basis for the account, in which the other party must show error by proof before the master. 2 Daniell, Ch. Pr. 1222. The seventy-ninth equity rule of this court is almost an exact copy of the sixty-first English rule. The defendant, by his deposition, has proved his account as stated in the county court to be correct, and under this rule of the court he could, without any leave of the court, offer it before the master as his account, and it will be so treated now.

By this settlement it appears that there came into the hands of the executor $26,590.02, which he has paid out. Of these disbursements he paid to his brother, the late Joel L. Pulliam, some $21,101.15, on 12 notes he held against his father, aggregating, without interest, $17,-659. These notes, which are produced in evidence, bear various dates, from April 21, 1856, to June 2, 1862. The defendants also produce three papers which are called settlements, all in the handwriting of the said Joel L. Pulliam, which it is proved were among the papers of his father. They are dated April 21, 1856, November 18, 1859, and January 1, 1863, and are informal statements of indebtedness, with calculations of interest and credits referring to these notes, and showing how the amounts of the notes are arrived at.

It is alleged in the bill that these notes, or some of them, were paid during the life-time of the father, and that they, with these

statements, were abstracted, by collusion between these brothers, for the purpose of using them as debts to absorb the assets and defeat the provisions of the will in favor of the widow. There has been no proof introduced to sustain this charge, and it is sought to be established solely by circumstantial inferences. The relation between the father and son is sufficient to explain the accumulation of so large an indebtedness, running for such great length of time. The fact that this executor, having paid the outside debts, paid over all this money to his brother on these claims without retaining anything to pay a debt due to himself, or any commissions for himself as executor, together with the other facts relating to the plans adopted to avoid the statute of limitations and protect A. B. Pulliam's land, when taken in connection with the other circumstances, that by this means the notes, which came to the testator by his marriage with this plaintiff, and which, by the will, he has given to her discharged of any liability for debts, have been absorbed in the payment of these claims due Joel L. Pulliam, are sufficient to arouse (considering also the charges made against her by the cross-bill) at least an acute suspicion of unfair dealing between these brothers to defeat her rights under the will; and they justify the defendants in the introduction of proof to sustain their characters against the imputations of the bill. But, after all, the facts show conclusively that this debt from the father to the son did exist, and a court cannot, on these circumstances, override the presumptions arising from the possession of the notes, and infer that men of their high character have abstracted them from their father's papers for a fraudulent purpose. The circumstances show unusual favoritism by the executor for his brother as a creditor, and possibly if this plaintiff had been his own mother she would have had no cause of complaint, for it is much more probable that creditors would have been sacrificed, if sacrifice were necessary.

But there can be no dispute that the plaintiff's notes were assets in the hands of the executor, liable under the law to the payment of debts, in the absence of other assets for the purpose. The proposition suggested in the bill, that the wife could claim them by survivorship, was not seriously pressed at the hearing, and has no support under the facts of the case.

It is conceded by counsel for the plaintiff that the notes of Joel L. Pulliam were not barred, at the time of the testator's death, by the common statute of limitations of six years. This being so, they were good vouchers to the executor, unless barred by the dead man's statute, by which it is provided that all claims against a decedent shall be

demanded and paid on suit brought for them within two years and six months from the date of the qualification of the executor. Tenn. Code. § 2279. But there were payments made to Joel L. Pulliam after January 1, 1869, which, owing to a suspension of the statute during the war, is the date of the expiration of the time allowed for payment (*Boothe* v. *Allen*, 4 Heisk. 258; *Webb* v. *Bronner*, 11 Heisk. 305) of about $9,000. This must be disallowed, unless the following paper operates to take the case out of the rule of this statute.

By the Code, "if any creditor, after making demand of his debt or claim, delay to bring suit for a definite time, at the special request of the executor or administrator, the time of such delay shall not be counted in said period of limitation." Code of Tenn. § 2280, and notes. The payments made after the bar attached are sought to be justified by a special request under this statute, and which is as follows:

"*To J. L. Pulliam, Somerville, Tennessee:* In the matter of your claims of all descriptions against the estate of our father, John N. Pulliam, in settlement of which estate I am acting as executor, I request that you do not enforce same by suit or legal proceedings, as the assets of the estate are not yet collected by me sufficient to pay the debts due and owing by John N. Pulliam. By your delaying to sue it shall not prejudice your claims, as I will not avail myself of the statute of limitations applicable to executors, adminstrators, etc.

"*May*, 27, 1868. J. J. PULLIAM."

This request for delay is special, but the question is whether or not *the time* to be deducted is fixed and definitely ascertained. It is said by the plaintiff there is no demand shown; but the request implies a previous demand. *Puckett* v. *James*, 2 Humph. 565, 567; *Bank* v. *Leath*, 11 Humph. 515. The executor is not bound to plead the general statute of limitations, and, if the bar had not attached in the life-time of the decedent, he might waive it. *Batson* v. *Murrell*, 10 Humph. 301. But there is no such discretion to waive the dead man's statute, and it enures to the benefit of legatees, who may always set it up. *Brown* v. *Porter*, 7 Humph. 373, 383; *Batson* v. *Murrell*, *supra*; *Byrn* v. *Fleming*, 3 Head, 658, 663; *Wharton* v. *Marberry*, 3 Sneed, 603; *Wooldridge* v. *Paige*, 1 Memph. L. J. 212; *Woodfin* v. *Anderson*, 2 Tenn. Ch. 331. In the last case the words were these: "I request that no suit shall be brought on this note, and agree that the statute shall not run against it." *Held*, not good. These are almost the very words of the last clause of the paper be-

fore us, and it is plain they add no force to it, and cannot take the case out of the statute. Does the first clause?

The original act of 1789, chapter 23, § 4, read: "If any creditor, who, after making demand of his debt, shall delay to bring suit, at the special request of the executor or administrator, that then and in that case the said debt or demand shall not be barred during the time of such indulgence." In the case of *Trott* v. *West*, 9 Yerg, 433; S. C. Meigs, 163, the request was to delay "for a short time," with a promise "to pay soon," accompanied by a partial payment. It was held not to comply with the requirements of this statute, the court saying: "The proviso clearly means that the special request shall stipulate for special delay, *for a definite time of indulgence*, during which the statute shall not bar the claim." In *Puckett* v. *James*, 2 Humph. 564, the testator owed a debt for certain land he had purchased, and the executor requested another creditor to delay a debt due him "until the land was paid for," which he agreed to do. The court held that this was for a definite time of indulgence:

"Not, to be sure," says the court, "for a particular *length* of time named in the request, but for the time that might elapse until he could accomplish a certain *event* named and stipulated in the request. There is nothing vague or indefinite in the period here fixed, for, if the land were paid for, the statute would run from that period in the same way that it would if a particular day of a specified year had been named."

By this decision it was first adjudged that the definite time to be deducted may be measured by the occurrence of some *event* agreed upon as the basis of such measurement. In *McWhirter* v. *Jackson*, 10 Humph. 209, there was this indorsement on the claims: "The within account is accepted, and will be paid when means sufficient come to my hands." The circuit court charged the jury that this was sufficient under the statutes; but on writ of error the supreme court affirmed the judgment solely on the ground that by the promise the administrator had made himself personally liable, having admitted that he had collected money enough to pay the judgment; the court holding that the case was not governed by the act of 1789. In the case of *Bank* v. *Leath*, 11 Humph. 515, the request made by the executors was that the creditor should not sue "until they could procure a statement of the account between the testator and the bank;" and this was held to be a stated event and sufficient. In *McKizzack* v. *Smith*, 1 Sneed, 470, the administrator requested delay, and promised to pay "as soon as money enough should be collected;" and at another time, "as soon as Joseph Miller could collect some money." The

court said the case of *Trott* v. *West, supra,* had gone very far in construing the act of 1789 to mean that the request for delay should contain a stipulation for special delay, *for a definite time* of indulgence, and held that the request in the case was as definite as that in *Puckett* v. *James, supra,* and therefore good.

It is to be observed that the doubt here thrown upon the former construction of the act of 1789 has been since set at rest by the Code, which changes the old statute by inserting the words "for a definite time," so that now there can be no doubt on that point. This distinction between the act of 1789 and section 2280 of the Code is noticed in *Birdsong* v. *Birdsong,* 2 Head, 603, where the rule is stated to be "that the delay agreed upon at the request of the administrator to avoid the bar, must be for a definite time, * * * or to an event which may occur, and thereby render the period certain." A payment of part and a promise to pay the balance was held to be no request at all.

The first reported case after the Code is *Chestnutt* v. *McBride,* 1 Heisk. 389. The administrator, when requested by the creditor to have his claim settled, said, "Hold on! your claims are good;" and the court, in holding this to be insufficient, said: "It does not show a special request to delay, for a definite time of indulgence, or for any special period that can, by reasonable intendment, be reduced to certainty." In *Cook* v. *Cook,* 10 Heisk. 464, the court, without deciding the point, intimates plainly that a request "to be patient until I get shut of a big law suit in which I am engaged, and I will go ahead and pay off all claims," was not sufficiently definite. It was held that the creditor must make demand within two years after the time agreed on for delay expires, which was not done in that case. In *Galloway* v. *Murray,* 1 Tenn. Leg. Rep. 216, there seems to have been in words no special request for delay, and the question was whether one would be implied from the facts. The defendant, in a conversation with the plaintiff on the subject of a settlement, told him "that he wanted to settle the whole matter at once, but did not request any delay." The "clear import," says the court, "of defendant's language was that he would settle as soon as Mrs. Partee came up from Mississippi. No express request for delay was made further than these words import." There was no question about the definiteness *of the time* in this case,—that was sufficiently fixed, under all the cases; the only question being whether there was a *special request for delay,* and it was held there was. The latest case reported is *Langham* v. *Baker,* 2

Tenn. Leg. Rep. 141. The words of the request do not appear in the report, but the court says:

"Yet it has not been held that a general request for delay from time to time, or an assurance that the debt is good, will save the operation of the statute of two years. Such were the requests in this case; and when the statute is complete it is a *devastavit* in the executor or administrator to pay such barred debt for which he will be held liable."

These are all the cases on this particular subject of the definiteness of the time, but there are others illustrating the rigidity with which the courts adhere to these statutes to protect dead men's estates. Although the common statute does not run against a distributee, the administrator being an express trustee, yet, if the administrator die, this statute of two years attaches in favor of his representatives; the administrator is himself bound by it, as to his own debt, and must pay himself within the two years by settling with the clerk and having his debt allowed; and the state is itself barred by it, even for taxes, which is not so as to the other statutes of limitation. *Galloway* v. *Murray, supra; Brown* v. *Porter,* 7 Humph. 373; *Hamner* v. *Hamner,* 3 Head, 398; *Byrn* v. *Fleming,* Id. 658; *State* v. *Crutcher,* 2 Swan, 514. The Massachusetts cases under a similar statute, referred to in *Trott* v. *West, supra,* are to the same effect. *Dawes* v. *Shed,* 15 Mass. 6; *Waltham Bank* v. *Wright,* 8 Allen, 121; *Jenney* v. *Wilcox,* 9 Allen, 246; *Bradford* v. *Forbes,* Id. 365; *Wells* v. *Child,* 12 Allen, 333.

Having gone over these cases with the utmost care, I am of the opinion that the paper offered in evidence here does not show that any definite time was agreed upon for the duration of the delay, and that it is impossible to say from it, by reference to any event, how long the delay should continue. He gives as his reason for asking delay the fact that he had not yet collected assets to pay the debts of the testator. If any implication can possibly be based on the language of this paper, it is that the collection of sufficient assets to pay *all* the debts of the testator is the *event* which is to fix the duration of the time of indulgence. This may never happen, and according to the position taken by the defendants has not yet happened, now quite eleven years from the date of this paper. It was apparent to these defendants—on their theory of this case, that the executor had nothing to do with the real estate—then, as now, that this event would never happen. The fatal defect of this paper, in this regard, is too obvious to require further consideration.

It was suggested that the proof shows that there were then pending

suits on the notes which came into the hands of the executor, and that it was the end of these suits to which the parties obviously looked as the duration of the delay. This paper does not say so; the parties have reduced their contracts for delay to writing, and we cannot look beyond it, nor imply anything in its favor, not necessarily implied from the language of it. In *Galloway* v. *Murray, supra,* the learned judge, in delivering the opinion, says:

"It is manifest from the decisions that there has been a departure from the strict letter of the statute in order to administer it in its spirit, and to meet the right and justice of the cases as they may arise. The statute was never intended as a snare by which to entrap the unwary and credulous creditor, and when such a case is presented, if clearly within the equity of the statute, no refined and technical construction should be allowed to defeat the right. After the administrator has negotiated for delay and obtained it, with or without a special verbal request, *and the effect of it has been to paralyze the vigilance of the creditor,* and the administrator seeks advantage of his own wrong, certainly the statute must be held to protect the creditor and save the bar. In such case we hold the spirit of the law is answered."

This doctrine is urged in the argument here, but it does not apply. Such a case is not presented by this record. This creditor can make no pretence of having been paralyzed by this transaction or by this executor. This paper is in the handwriting of Joel L. Pulliam. He is proved to have been an eminent and able lawyer, familiar with the administration of estates, and capable of taking care of himself; and the executor was his brother, acting under his guidance and in his interest.

We come now to the determination of the rights of the plaintiff under the will, as against the executor, in relation to the notes the testator received of her at their marriage, and other property bequeathed to her. Of course the plaintiff must take all the property subject to the rights of creditors, it being impossible for the testator to give his property to his wife, exempt from liability to them, whatever power he had to direct the order in which the property should be liable. Wills of both real and personal property, in the United States, are made subject to the rights of creditors; and to the extent that it is necessary to appropriate the property to the satisfaction of their demands the intended bounty is defeated. 2 Cooley's Black. Com. 378, note 10. This is a matter to be determined upon the taking of the account, and the executor is liable only so far as assets have come or should have come into his hands sufficient to pay these bequests to the wife after the payment of all debts, for the payment of which he shall be allowed in the settlement.

It is conceded that two of the notes collected by the executor—that of Locke & Abbott for $1,735.49, and that of John L. Parham for $7,702.66—were received by the testator from the plaintiff (or her mother for her) at his marriage, and that they are the notes mentioned in the will; while, on the other hand, it is conceded by the plaintiff that the S. R. Carney note for $5,335.83 was not so received. But the point is made that the Locke & Abbott note having been renewed by the testator in his own name, instead of that of the plaintiff or her mother, as it originally stood, it is taken out of the category and does not pass by the bequest. I think the testator intended it should, and that the intention is plain; otherwise, there being only two, he would not have used the plural. Taking it in his own name was a reduction to possession, and would defeat the wife's survivorship; but it nowhere appears that he intended the bequests to be limited to such notes as would have survived to her. His language is: "I further will to her all of the notes I received of her at our marriage, of which I have collected but a small amount." This is plain and unambiguous.

The master, in taking the account, will therefore allow her these two and other notes which she may show came to the testator by his marriage with the plaintiff and were collected by the executor. If the judgment against E. S. and Darling Allen for $250, mentioned in the settlement, was on a note coming by the marriage, it will also be allowed. The Carney note will not be allowed, as she proves no claim to it. The specific articles of personal property will be allowed to her, unless it is shown either that they did not come into the hands of the executor, were necessarily absorbed in the payment of debts, or that she has received them. He will be credited with all she received.

As to the $10,000 of money admitted to be in her possession at the time of the testator's death, the will gives it to her in the plainest terms. It may have been assets for creditors on failure of all other resources, but it was not her duty to surrender it to the executor. No creditors are here asking to have it applied to their debts, and the executor, as to the creditors, has settled his accounts and been discharged; nor does it appear that there are any creditors unpaid not barred by the statute of limitations.

The next question to be determined is that relating to the real estate. It appears that the testator had a quantity of land in Arkansas and some in Tennessee. It is not denied, and cannot be, that this will charges the debts of the testator upon all the other

property, real and personal, in exoneration of the legacies given to the plaintiff; and the defendants concede that as to any property remaining after the payment of the debts owed by the testator at his death, the plaintiff can be subrogated to the rights of creditors who have been paid with her money, and may now subject such other property to the payment of her legacies. *Alexander* v. *Miller,* 7 Heisk. 65. And they say this is all the equity she has under this will. She claims it was the duty of the *executor* to execute this will by selling the lands to raise a fund to pay the debts, and, not having done so, he has committed a fraudulent breach of trust, and is now liable to her absolutely for the value of her legacies, and she asks for a personal decree against him to satisfy her claim, and this without reference to the value of the lands. The executor insists that the will does not give him any power to sell the real estate in Tennessee or Arkansas, either expressly or impliedly, and that he had only the ordinary remedy of an executor to sell lands where the estate is insolvent or the personal assets insufficient under our act of 1827. Tenn. Code, 2267, 2326, 2362. In *Alexander* v. *Miller,* 7 Heisk. 65, 77, the supreme court of Tennessee holds that where there is no power or authority conferred by the will to sell real estate the executor can sell no portion of it, nor apply it to the payment of debts; and, while the general rule is that the personal estate is primarily liable to the payment of debts, if it is exonerated by the express terms of the will, or by implication, a different rule applies. The policy of the law is to give effect to all the provisions of the will—those in favor of legatees as well as those in favor of devisees; and where the real estate is charged with neither debts nor legacies by the will, but descends to the heir at law, a court of equity will marshal the assets in favor of specific legacies of personalty and substitute the legatee in place of the creditor. But it is plain from this case that where the will, by express terms or impliedly, confers power on the executor to sell the lands for the exoneration of the legatees, it is not necessary to resort to this equity of subrogation, for in such case the executor may do, under the powers of the will, what otherwise could only be done by a resort to this equity of subrogation. In *Dunn* v. *Keeling,* 2 Dev. L. 283, it was held that the words "after all my just debts are discharged," attached to a devise of real estate, do not confer a power on the executor to sell. But this will goes further than that, and does not depend for the implication of a power to sell upon such barren words as those above quoted. The words here are: "Everything I have named and given to my wife she is to have and do as

she pleases with; none of my children is to put any claim to the same, nor any other person. I further will and say, the next item, after carrying out all I have named above, is that my executors shall pay all of my just debts out of the remainder of my estate, and then make Alfred and Rachel equal," etc. Then, after appointing his three sons executors, without security, he says he wishes "that all of my business shall be settled without being recorded or going into the court-house." Taking the whole will together, it can scarcely be doubted that it was the intention of the testator to confer ample powers upon his executors to carry out this will, by selling the real estate, if necessary, to pay his debts, in exoneration of the particular legacies to his wife. That he had his lands in mind is plain, for he had given his wife choice of one section of the Arkansas lands; and after the above-quoted direction to pay his debts out of the remainder of his estate, he directs how the Isbell plantation shall go to Alfred, and be accounted for by him. The word "estate," unqualified or restricted, is always construed to embrace every description of property, real, personal, and mixed. *Gourley* v. *Thompson*, 2 Sneed, 386, 393; *Brown* v. *Crawford*, 9 Humph. 164; *Archer* v. *Deneale*, 1 Pet. 585; *Lewis* v. *Darling*, 16 How. 1. It was held in *Williams* v. *Otey*, 8 Humph. 563, that where property was conveyed by deed in trust to pay debts there was a necessary implication of power to sell in the trustee; and the authorities are explicit that where a will gives the power to sell land, if necessary or advisable, during the course of administration, it belongs by implication to the executor. *Chandler* v. *Rider*, 102 Mass. 269; *Peter* v. *Beverly*, 10 Pet. 532; *Bank* v. *Beverly*, 1 How. 134; *Fenwick* v. *Chapman*, 9 Pet. 461; *Taylor* v. *Benham*, 5 How. 233; *Robertson* v. *Gaines*, 2 Humph. 366; *Lockart* v. *Northington*, 1 Sneed, 317; *Porter* v. *Greer*, 1 Cold. 568; *Queener* v. *Trew*, 6 Heisk, 59, 61; *Green* v. *Davidson*, 4 Bax. 488. The case of *Queener* v. *Trew, supra*, states the rule to be that not only will the executor be designated by implication as the donee to execute an express power of sale, but the power of sale itself will be implied from the nature and character of the requirements of the will, where it is manifest that the purposes of the testator cannot be carried out without a sale; and such is undoubtedly the law. It is argued for the plaintiff that under the laws of Arkansas the executor could have sold the lands there without probating the will, or by probating it simply without taking out letters, and that under this will he might have maintained ejectment. It was decided in *Peck* v. *Henderson*, 7 Yerg. 18, that a mere power to sell for the payment of debts

did not break the descent to the heirs, nor confer such title on the executor as would enable him to maintain ejectment. But if the executor assumed the burden of executing this will in Arkansas by his qualification in Tennessee, he was, by all the authorities, bound to do whatever was necessary under the laws of Arkansas to effectuate his power of sale, and convert the lands into money for the payment of debts. It is not pretended that he has done anything as respects the land, and he concedes that whatever was imposed upon him in this regard has been wholly neglected. What, then, was the legal effect of his qualification as executor in Tennessee alone?

This was the domicile of the testator, and the administration in chief was here; all other administrations were ancillary to this. The administrator or executor at the domicile may always lawfully receive and give acquittances for assets in another state. *Wilkins* v. *Ellett,* 9 Wall. 740; *Trecothick* v. *Austin,* 4 Mason, 16, 32; *Swatzel* v. *Arnold,* 1 Woolw. 384, 389. In the last case it is said by Mr. Justice Miller that the impediment to the exercise of full powers, even by an administrator, in a jurisdiction foreign to that of granting his letters, is essentially technical and formal, and should not be strained beyond its necessary application. The supreme court of Tennessee says in *Young* v. *O'Neal,* 3 Sneed, 55, that "as an executor or administrator has no authority to sue for or collect the assets of which the deceased may have died possessed in a foreign country, the law does not impose on him the duty of doing so. He has no title to or authority over the assets in another state; neither is he responsible therefor." And it was held that a voluntary payment to a foreign administrator was not good. But in *Wilkins* v. *Ellett, supra,* the supreme court of the United States repudiates that doctrine, and holds that "the original administrator, with letters taken out at the place of the domicile, is invested with the title to all the personal property of the deceased for the purpose of converting the effects of the estate, paying the debts, and making distribution of the residue, according to the law of the place *or directions of the will, as the case may be.* ✳ ✳ ✳ The difficulty does not lie in any defect of title to the possession, but in the limitation or qualification of the general principles, in respect to personal property, founded upon the policy of the foreign country, to protect home creditors." Now, it is just as competent for a testator to convert his lands into personalty by will, and invest his executor with the duty of so administering it, as it is for the law to confer upon an administrator the title to personalty in a foreign jurisdiction. Lands charged with the payment of debts are always considered per-

sonalty. *Craig* v. *Leslie*, 3 Wheat. 563; *Cropley* v. *Cooper*, 19 Wall. 174; *Peter* v. *Beverly*, 10 Pet. 532. But, treating it as real property, where a will devises either a power or an estate in lands, the devisee, whether he take as executor or otherwise, takes title under the will and not by virtue of letters testamentary. These are only the evidence that he is executor, and do not add to his title or estate. Therefore, the principle of *Wilkins* v. *Ellett, supra*, will apply to lands in a foreign jurisdiction, when the will devises them, just as well as to personalty, provided, always, that the will is in conformity to the law of the place where the land lies. And this doctrine, that because executors cannot sue for or recover assets in a foreign jurisdiction the law imposes no duty on them, and they cannot be called to account for such assets, has always been limited to suits about matters pertaining to their official character, and is generally invoked only to protect other persons and their rights, such as suits on their bonds, creditors, purchasers, and the like, and never to protect them against a breach of trust; and they may and often do occupy two relations: that of executors, in the sense that they are the *representatives* of the deceased, and that of trustees for the parties entitled to the funds coming into their hands, or to the property with which they have been vested for the purposes of the trust. And in their capacity of trustees they are often held liable in a court of equity both for assets received and breaches of trust, in relation to assets in a foreign jurisdiction and to matters not coming within the scope of their liability as executors. For example, they are liable *as executors* only for *legal assets*, nor can their sureties be liable beyond that; but a court of equity will, nevertheless, hold them to account for equitable assets and all breaches of trust whatever. Their liability as executors is frequently limited or enlarged by statutes regulating the administration of estates; but such statutes do not necessarily affect the equity powers of the federal courts. Hence, in determining a question like this, we do not consider state statutes, nor state decisions, further than they furnish rules of property to be enforced, or rules of evidence to guide in the ascertainment of facts. The probate of a will and the appointment of an executor being exclusively within the jurisdiction of the state courts, we are concluded by his letters as evidence of his official character, and the judgment of the probate court, whether the instrument be a will or not; but the will being proven, and the executor appointed, the proper construction of the rights, duties, and powers of the executor, under the will, are not authoritatively controlled by either state statutes or state decisions.

So that, if the construction placed by the learned counsel for defendants on these statutes and decisions warrants the position that, by accepting the execution of the will only in Tennessee, the executor had no authority to sue for or collect the assets in a foreign country, and no duty imposed upon him to do so, it does not follow that the same rule will prevail here. But I do not think the decisions in Tennessee, properly considered, maintain the position. *Swancy* v. *Scott*, 9 Humph. 326, determined that the residence of a *debtor* is the *situs* of the debt, and the administrator of that *situs* was the proper party to collect it, notwithstanding the evidence of the debt was a judgment in another state. It did not appear that there was any administration in the domicile of the judgment plaintiff, Kentucky; and it was not decided what would have been the rights of such domiciliary administrator except that he could not have sued in Tennessee without taking out letters here. This was so, because Tennessee had not authorized a foreign administrator to sue in her courts, and by statute had authorized and required a local administration in such cases. But it does not follow because an executor may not sue in a foreign jurisdiction, without taking out letters testamentary, he has no duty imposed upon him to take out letters or do whatever the local law requires, to give effect to the title he has acquired by the will. His designation in the will as the choice of the testator for that trust imposed upon this executor the duty of taking out letters in Tennessee, and it was this designation that gave him the right to take out letters. And the same designation evidently imposes the same duty as to property situated in Arkansas, not because he has taken out letters in Tennessee, but because he has assumed the trust of execution. The qualification in Tennessee is the manifestation of his acceptance of the trust imposed upon him to execute this will, unless he can accept part and decline part; select such duties as are agreeable to him, like those of collecting the notes given to the widow, and paying the proceeds to his brother, as a creditor, and refuse such as are disagreeable to him, like those of subjecting the assets first to the payment of debts.

It is manifest that the testator did not contemplate such a disastrous separation of these trusts, and that the will does not readily accommodate itself to such an arrangement. It is almost absolutely essential to the rights of this plaintiff that the same person should have the execution of the will everywhere; and no just man, when he came to consider whether he should accept this trust, would for a moment have hesitated to decline, if he supposed at the time that by

abdicating his powers over the Arkansas land the result would be to defeat the intention of the testator to have it applied first to the payment of his debts in exoneration of this legacy. The solicitude of the testator that this should be done by his executors, named in the will, is so apparent that no one who intended to execute *the will* rather than control the assets should have failed to see that to accomplish that intention would be the first duty of an executor, and that a failure to accept the whole trust would almost necessarily defeat that purpose of the testator. A trustee cannot separate the trusts—accept part and decline part: the acceptance of any part is the acceptance of the whole. Perry, Trusts, § 264 *et seq.* Where an executor is also trustee of the real estate, he cannot desert the situation of trustee and accept that of executor. By acting as executor he is liable in both characters; the taking of probate is an acceptance of the whole trust. *Ward* v. *Butler*, 2 Molloy, 533; *Mucklow* v. *Fuller*, 1 Jacob, 198, 201; *Worth* v. *McAdam*, 1 Dev. & Bat. L. 199, 209. The Tennessee cases cited in argument (*Snodgrass* v. *Snodgrass*, 1 Bax. 163; *Gilchrist* v. *Cannon*, 1 Cold. 587; *Keaton* v. *Campbell*, 2 Humph. 224; *Martin* v. *Peck*, 2 Yerg. 297; *Peck* v. *Henderson*, 7 Yerg. 18; *Peck* v. *Peck*, 9 Yerg. 300; *Allsup* v. *Allsup*, 10 Yerg. 284; and *Hughlett* v. *Hughlett*, 5 Humph. 452,) do not support the position that one named in the will as executor can choose to qualify in Tennessee, and decline to qualify elsewhere, and thereby separate the trusts. They go to the extent of holding that, if this executor had given bonds, his surety would not be liable for any of his breaches of trust as to the Arkansas assets, and that the probate court would have no jurisdiction to charge him in the settlement of his accounts as executor with them, nor the law courts to charge him as for a *devastavit* concerning them; but not that a court of equity may not compel a full and complete execution of all the trusts of the will; and that a court of equity will enforce such an execution of the trusts finds abundant support in these cases, when taken in connection with other adjudications: *Andrews* v. *Andrews*, 7 Heisk. 234; *Williams* v. *Bradley*, Id. 55; *Milly* v. *Harrison*, 7 Cold. 191; *Hubbard* v. *Epps*, 1 Tenn. Leg. Rep. 320; *Drane* v. *Bayliss*, 1 Humph. 187; *Deaderick* v. *Cantrell*, 10 Yerg. 263; *Lafferty* v. *Turley*, 3 Sneed, 157. See, also, *Schultze* v. *Pulver*, 3 Wend. 363, and *Re Butler*, 38 N. Y. 397, which hold that the executor must go into another state and qualify, when necessary to execute the trusts of the will. By sections 2221 and 4069 of the Tennessee Code the executor takes an oath that he will perform the will of the testator.

But, whatever the rule in a Tennessee court of equity, there can be no doubt in the federal courts that the will is the executor's law, and its trusts are all binding on him. *Lewis* v. *McFarland,* 9 Cranch, 151; *Potter* v. *Gardner,* 12 Wheat. 498; *Boyce* v. *Grundy,* 9 Pet. 275; *Fenwick* v. *Chapman,* Id. 461; *Peter* v. *Beverly,* 10 Pet. 532; *Bank of U. S.* v. *Beverly,* 1 How. 134; *Taylor* v. *Benham,* 5 How. 233; *Lewis* v. *Darling,* 16 How. 1; *Vaughn* v. *Northrop,* 15 Pet. 1. The argument is made that the creditors, not being bound by the order of appropriation of assets made in the will, could have subjected these notes to their debts, and that this executor has only done what by law he could have been compelled to do, and therefore has wronged no one. It may be doubted on the foregoing authorities whether the creditors could do this to the injury of the plaintiff, and there are many expressions by the supreme court of the United States in these cases that would justify the holding that even creditors can be controlled in their rights to the personalty by forcing them to exonerate the one fund to which this plaintiff must look for her satisfaction. But creditors took no steps to obstruct the intention of the testator. They did not set up any claim of this kind, and did not force the executor to disobey the will. His duty was to execute it according to its terms. He need not pay the legacy until he knows it will not be needed to pay debts; but he has no authority to change the order of appropriation mentioned in the will. The creditors could take care of themselves.

In *Gaines* v. *New Orleans,* 6 Wall. 642, 713, the purchasers of the testator's land sought to protect their title by showing that creditors were entitled to it under the administration laws, but the court says "they cannot substitute themselves for the creditors of the estate and use them as a means to get protection." The same principle applies here. This executor cannot protect himself against a breach of trust by showing that creditors had remedies against the trust which they did not set up. The law imposed on him an impartial administration of his trust.

I am therefore of the opinion that the defendant J. J. Pulliam is liable to the plaintiff for a failure to sell the lands in Arkansas under the powers granted to him by the will for that purpose, in order that he might exonerate her legacy by applying the lands first to the payment of the debts.

The extent of his liability will be now considered. By this will the lands were converted into personalty for the payment of debts, and are to be regarded, for all the purposes of this case, as money at the

time of the testator's death. Equity regards that as done which is required to be done. *Cropley* v. *Cooper,* 19 Wall. 167, 174; *Craig* v. *Leslie,* 3 Wheat. 563; *Given* v. *Hilton,* 95 U. S. 591. In *Taylor* v. *Benham,* 5 How. 233, the case was somewhat like this: A South Carolina executor was charged by bill in Alabama for money received by the sale of lands in Kentucky, and the court would have charged him for the land in Kentucky not sold but for the fact that the legatees had intermeddled with him by appointing other agents to sell, and for other circumstances. The rule is there laid down that a trustee is not liable for more than he actually receives, except "in cases of very supine negligence or wilful default." If this executor had sold these lands at the time he should have done, he would have realized their value; and he will be treated here and charged in the account just as if he had done his duty. Hill, Trustees, 522, 523, and cases cited. The plaintiff cannot ask more than his proper diligence would have produced. There should be no penalty affixed to him like charging him absolutely with plaintiff's legacy. He is not bound to her unless all the assets he could have realized were sufficient to pay the lawful debts and her legacy. The master will be therefore directed to charge the executor with the value of these Arkansas lands, and he will find the highest value at any time from six months after the date of his qualification (which time the law allowed him to ascertain the condition of the estate: Tenn. Code, § 2274) to the end of the two years he was allowed to settle the estate. Code of Tenn. § 2295. He certainly should have sold the lands within this period to have been diligent, and the highest value is all that should be charged against him.

But the plaintiff had specifically devised to her one section of the Arkansas lands, she making her own selection out of all the lands in that state. This selection she has never made, and it is argued that the executor is not chargeable, because, until she does select, he cannot sell. This might do if the executor had shown that his efforts to execute the will had been impeded by her failure to select. But he repudiated all obligations on himself in relation to these lands, and cannot complain that she made no selection, and his liability cannot be excused on this ground; but he is not liable for the section devised to her. It is to be presumed that if the executor had proceeded to discharge his trust she would have selected the most valuable section of all the lands, and equity will treat this as having been already done. The master will therefore ascertain the value by sections, and deduct from the whole value that of the best section, and charge the

executor only with the residue. And the plaintiff may now select one section, the title to be secured to her by conveyance from the defendants according to the practice of the court. *Boyce* v. *Grundy, supra; Lewis* v. *Darling, supra; Hickey* v. *Stewart,* 3 How. 750; *Watts* v. *Waddle,* 6 Pet. 389; S. C. 1 McLean, 200; *Watkins* v. *Holman,* 16 Pet. 26.

By this will the testator bequeathed to Alfred B. Pulliam his Isbell plantation, valued at $6,000, to be taken into account as part of his estate received from the testator. It is claimed by the plaintiff that this land is also charged under the will with the debts of the estate in exoneration of her legacy. This is undoubtedly true, and in that respect it occupies no other attitude than does the Arkansas land, and its value must be charged against the executor in the same way. The fact that it is specifically devised does not relieve it from the burden put upon it by the testator in favor of the plaintiff. By such devise an equity is no doubt created that this land shall not be touched for debts until all the other property has been exhausted. *Darden* v. *Hatcher,* 1 Cold. 513. Nor does the statute of limitations protect the land. He held it under the will and is bound by its trusts. It may be that, as between him and the executor, the statutes of limitation would protect the land against the exercise of the power of sale for debts, but the equities between these devisees is not of that character which is barred by the statute of limitations. As against the executor the plaintiff has a right to an account, charging him with the value of the land just as if he had sold it to the best advantage in the execution of his trust.

But it appears by a paper offered as proof that on the twenty-second day of June, 1863, subsequent to the date of the will, the testator by deed of gift, in consideration of love and affection, conveyed an undivided half of the Isbell plantation to Alfred B. Pulliam, to whom the will devises the whole. Alfred B. Pulliam says in his answer that he went into possession soon after his father died, and has been in possession ever since. It is manifest, then, that he did not go into possession under the deed, at least until after his father's death. He also says in his answer that he acquired by deed of gift from his father one-half of said land, the deed being made in 1863, and being of record. This answer was filed in July, 1877. It does not exhibit the deed, nor is it proved or produced otherwise than by its production by his counsel at the hearing. It is said in the answer that it was registered as required by law. It appears by the certificates upon it that on the twentieth of July, 1872, the day after the final settlement of the executor was filed in the county court, and

when it was apparent that his land might be needed to answer the trusts of the will, this deed of gift was proved by Joel L. Pulliam, one of the subscribing witnesses to it, who states that he signed the name of the other witness, and saw him make his mark, the said other witness being then dead, and on this proof the deed is registered. This proving of the deed took place nearly seven years after the death of the testator, and there is no explanation found in the answers or in the proof of any of these circumstances; and the possession of this paper from the time of its execution till now is not shown to have been in Alfred B. Pulliam, except by the production of it by his counsel at the argument of this case. Its *delivery* is proved in no other way than by the statement of Joel L. Pulliam, one of the subscribing witnesses, before the clerk authorized to take proof of deeds, that the testator acknowledged the instrument, in his presence, to be his act and deed, for the purposes therein contained. This would be sufficient, ordinarily; but it seems to me, under the circumstances of this case, nearly seven years after the death of the grantor, these parties should have shown something in explanation of the long delay in proving this instrument for registration, if it had been duly delivered and relied on as a muniment of title, particularly where it is admitted that possession of the land did not accompany the deed. The registration of it does not prove it, for it has not been proven and registered according to law. Joel L. Pulliam, the subscribing witness, was not competent to prove the signature of the other witness, (in this case written by himself and signed with a mark.) The Code of Tennessee, § 2055, enacts that "if all the subscribing witnesses be dead, * * * except one, he may prove the execution of the instrument before the clerk or deputy clerk of the county court, the handwriting of the other person being proved *by some other person;*" and the act of 1869, *c.* 122, § 1, (Code, 2055*a*,) requires that the proof of the handwriting of the deceased subscribing witnesses shall be by *two persons* acquainted with his handwriting. It is, therefore, plain that this deed is not admissible in evidence and must be excluded. This view of the case renders it unnecessary to inquire as to the effect of a deed of gift granting the land after the date of a will devising it; or whether the devisee, if he takes part under the will, must be held to take the whole under it.

It further appears, in reference to this Isbell plantation, that the testator and Joel L. Pulliam originally purchased it jointly, each owning an undivided half. The deed to them is dated June 30, 1856, and conveys the land absolutely for $4,400, acknowledged to be paid.

On the eleventh day of March, 1858, Joel L. Pulliam, by deed, conveyed absolutely to his father an undivided one-half of the land for the consideration of $2,200 to him "in hand paid, and balance to be paid." A paper called an obligation, also dated March 11, 1858, signed by John N. Pulliam, is also introduced in evidence, by which it appears that the two purchasers from Isbell executed in payment of the purchase money their four bonds for $1,100 ˙each, payable respectively December 25, 1857, 1858, 1859, and 1860; that J. N. Pulliam had paid the first of these. bonds, and by this instrument obligates himself to pay the others; and, in consideration of his having paid the first bond and binding himself to pay the others, the deed by Joel L. Pulliam to his father was made. This paper is not registered; neither it nor the deed reserves any lien on the land to secure the performance of this obligation; neither does the deed from Isbell to them reserve any lien. It is claimed in the answers and said in the depositions that the testator did not fully pay for the land, and that at the time he died the encumbrance for the unpaid purchase money was greater than the value of the land. This fact is sought to be established by inferences as to the value of the land drawn from the consideration mentioned in the deeds; for the parties have not seen fit to prove its value, nor the exact amount of the unpaid purchase money. It is said in argument (though the facts are not proved in the record) that the alleged lien for the purchase money was foreclosed,—how, does not appear,—and that the land was purchased by Joel L. Pulliam, and by him conveyed to Alfred's children.

The theory of the defendants is that Alfred B. Pulliam took one undivided half of the land *under the deed of gift,* discharged of all liability for the purchase money due; that he took the other half under the will subject to an encumbrance for the whole of the purchase money, and because there would be nothing left after paying the encumbrance, the executor had no duty to perform, and is not to be charged with anything on account of this land. But it does not legally appear here that Alfred had any deed of gift; and, if it had taken effect, it is questionable whether he could claim that half discharged of its liability for the purchase money as against his codevisees. It was the executor's duty to sell this land for the payment of debts. If the debt for the purchase money was a valid and subsisting one, not barred by the statute of limitations, he could have paid it, and it was his duty to pay it, and he would be entitled to credit in his accounts for the amount paid. If the debt became barred by the

two years and six months' statute, the bar enured to the benefit of the devisees and legatees under this will; and if not paid or sued for within the time it was forever barred in law or equity by the express language of the statute. If Joel L. or Alfred B. Pulliam has paid off this encumbrance it is not shown by this record. They could not by such payment create against the plaintiff any debt or obligation to refund them the money, or indeed any equity, except the right to be subrogated to whatever claim the original creditor had against the estate, nor could they, as against the executor, enlarge the rights of the original creditor.

If the creditor within the two years and six months had filed a bill to enforce his lien, and it were in fact a valid and subsisting lien for a debt due by the testator, and by the proceedings the executor was divested of his title in the land, or the devisees became divested of their title, so that the executor could not execute his power of sale, then he would be discharged from any further liability as to the land, unless it could be shown that by neglecting to sell and pay off the encumbrance the plaintiff had been sacrificed. But he sets up no such defence, his theory being that as executor he had nothing to do with the land. But he should have defended against any encumbrance, if invalid, and defeated it; if valid, he should have paid it, if his accounts show that he had assets for the purpose or could have raised a fund by the sale of property.

I cannot say from this record whether Isbell had a debt against the testator. None is proven, nor are the bonds produced, nor is there any proof that they were a lien on the land or valid. It does appear by the recitals in the obligation of March 11, 1858, that J. J. Pulliam was a surety on the purchase-money notes; if this be so, it is possible there was not even an equitable vendor's lien. I think, in taking an account like this, the defendant may before the master prove any fact which will excuse him from liability, and he may therefore make such proof as he may be able on this subject of the encumbrance and the master will report the facts. He will, however, charge the executor with the full value of the whole land, as already directed in the matter of the lands in Arkansas, and report the facts as to this alleged debt to Isbell, and the alleged encumbrance, and the present condition of the title and ownership of the Isbell plantation.

The question of the post-nuptial contract of October 20, 1860, arising on the original bill, does not seem to me to be a practical one. The condition of this estate does not indicate the possibility of any residuum after paying the legacies to which the plaintiff is entitled

under the will. The most that is or can be claimed by the plaintiff under this contract is the power to dipose by will of $10,000 of the testator's estate. If that is to be secured, possibly the only way would be, as claimed by the plaintiff, to set apart the amount at interest, pay the interest to the residuary legatees, and grant leave to the plaintiff's appointee after her death to apply for the fund. I shall reserve all the questions arising about this contract till the coming in of the master's report, and if it shall then appear that there will be any fund in the hand of the executor this can be determined.

The defendants file a cross-bill, in which they allege that during the late war their father was possessed of some $20,000 or $30,000 of gold coin, which he buried for safety near the residence of the plaintiff's mother, in an adjoining county to Fayette county, where their father and these defendants lived, but in the state of Mississippi; that this money has been fraudulently appropriated by the plaintiff; and that she should be held to account for it to them in this suit.

If we admit as competent all the proof offered on this subject, it falls far short of even tending to show that the plaintiff possessed herself of any of her husband's buried treasure, if such he had at his death. It is plain that much of the proof, if not all of it, by which it is sought to charge her with this gold, is wholly inadmissible. It consists entirely of declarations of her husband that he had gold buried of which she knew, most of them made when she was not present; and if she were present and heard such declarations, she would not be bound by them, and her knowledge of its hiding place would not prove that she appropriated it. It is incredible that twenty-five or thirty thousand dollars of gold should be buried, not far from the residence of these defendants, by their father, and they not make any further effort to recover or trace it than they are shown by this record to have made, if they believed it was there at the time of his death. The proof of any admissions by her of a knowledge of this gold is unsatisfactory, and it is not shown that she ever admitted that she got it. Her husband's statements that he had such gold, and had buried it where his wife and her brother could find it, will neither prove as against her that there was such hidden treasure within her power, nor that, taking advantage of her knowledge, she took it into her possession. 1 Greenl. Ev. § 185, note 2; *Smith* v. *Scudder*, 11 S. & R. 325; *Birdseye* v. *Flint*, 3 Barb. 500; 1 Greenl. Ev. §§ 197, 197*a*, 199, 200. The duress of the relation of husband and wife will often secure acquiescence in the false statements of each other. She accounts for the money shown to

have been lent to Trotter without any necessary imputation that she got it from the alleged hidden resources.

Nor can Joel L. Pulliam be charged with the possession of any of this treasure by the declarations of his father that he had placed some of the paper money injured by its burial in his hands to be redeemed at the treasury. The rights of the parties must depend upon their respective interests in the property shown to have had an existence at the time of the testator's death, and not upon any speculations as to what became of large quantities of gold which he boasted of having buried during the war, and which each of these parties affect to believe the other has obtained and appropriated. The cross-bill will be dismissed when a final decree is entered.

The question of interest is reserved. The master will calculate it as he may think lawful on the facts before him, and report his action and the reasons for it. On the coming in of the report, and its confirmation, the plaintiff will be entitled to a personal decree against the executor for whatever amount may be found in her favor on account of the legacies given her by the will, less so much of said legacies as were necessarily paid in the discharge of lawful debts. This disposes of her equity against the executor. Her equities against the other legatees and devisees are simple. She is entitled to be subrogated to the rights of creditors, so far as her legacies have gone to pay their debts, but no further. It is not her legacy which is charged upon the residuum of the estate, but the debts, and she is entitled to charge the lands or other property only so far as debts have been paid with her money. To that extent (and the master will report how this is) her claim will be a lien on the lands, to be satisfied first out of those devised to the residuary legatees, and last out of the Isbell plantation. I do not see that she has any equity against Joel L. Pulliam's estate for the money paid him, which was wrongfully paid, because barred by the statute of limitations. She must look to the executor for that, and has no claim to recover it back from the creditor. If the debts were fraudulent, as charged in the bill, she would have that right, but they are not. There being no regular master in chancery in this court, J. B. Clough, Esq., one of the commissioners of the court, will be appointed special master to take the account.