# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARTIN FLOREANI,<br>CHRISTINA FLOREANI, and<br>CHARLENE FLOREANI,<br><br>   Plaintiffs,<br><br>  v.<br><br>FLOSPORTS, INC.,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. 2023-0684-LM |

## POST-TRIAL FINAL REPORT
Final Report: April 9, 2024
Date Submitted: November 8, 2023

Scott J. Leonhardt & Zhao (Ruby) Liu, THE ROSNER LAW GROUP LLC, Wilmington, DE; Emanuel C. Grillo & Brigitte Sykes, ALLEN & OVERY LLP, New York, NY, *Attorneys for Plaintiffs*.

John L. Reed, Peter H. Kyle, & Daniel P. Klusman, DLA PIPER, LLP, Wilmington, DE; Benjamin D. Schuman, DLA PIPER, LLP, Baltimore, MD, *Attorneys for Defendant*.

**MITCHELL, M.**

## I. INTRODUCTION

This is a rather contentious books and records dispute that involves a private Delaware entity, owned by family members. Coloring this matter and atypical in Section 220 cases, there has been a profusion of bickering related to familial hostility and certain disclosed actions by family members—matters which I don't find relevant here. Petitioners seek to sell their shares of the company, FloSports, Inc. It is based in Austin, Texas and streams live "niche"[1] sports to its subscribers. To sell their shares of the private company, the Plaintiff stockholders need certain information from the company. The Plaintiffs want to first, value their shares, and then they want to communicate some of the company's information to potential buyers to effectuate a sale. FloSports has denied their requests, in part. They've given the Plaintiffs what they think is needed and contested the Plaintiffs' right to share the information with potential buyers.

FloSports has withheld certain information from the Plaintiffs amid concerns that the former CEO, the current CEO's brother, will use the company's information to compete using his new company, Rofkin. Because I find that the alleged competition between the companies does not negate the Plaintiffs' proper purpose to value their shares under section 220, I recommend FloSports to produce some of the requested document sets as explained herein. I also impose a reasonable confidentiality agreement in accordance with certain terms discussed herein.

## II. FACTUAL BACKGROUND[2]

### A. The Parties

Plaintiffs are Martin, Christina, and Charlene Floreani. They are all siblings of Mark Floreani, the Chief Executive Officer of Defendant FloSports, Inc. Flosports (the "Company") is a privately-held Delaware corporation, based in Austin, Texas, founded by Plaintiff Martin Floreani. FloSports streams live sporting events, highlights, editorial content, data and rankings for more than 25 sports to viewers around the world on a subscription-based model.[3]

The Plaintiffs, collectively hold 1,700,013 shares of common stock in the Company as follows: Martin Floreani holds 1,600,166 shares of common stock of the Company; Christina Floreani holds 53,090 shares of common stock of the Company; and Charlene Floreani holds 46,757 shares of common stock of the Company.[4] As shareholders, Plaintiffs commenced this summary proceeding pursuant to Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220") to compel FloSports to permit Plaintiffs to inspect certain of

---

[1] Tr. 11:2.

[2] The referenced facts are drawn from the factual stipulations in the parties' pretrial order, the evidence presented at trial (Transcript: "Tr._"), including the live and deposition testimony, and the parties' joint trial exhibits, which are cited as "JX __."

[3] JX 37.

[4] *See* JX 28, Exs. B-1 ¶1, B-2 ¶1, B-3 ¶1.

FloSports' books and records for the purpose of valuing their shares (the "220 Action").

Martin Floreani is the founder of the Company and ran it for twelve years.[5] He was replaced as Chief Executive Officer of the Company by the FloSports Board of Directors five years ago.[6] The Company is now controlled by Mark Floreani, Martin's brother.[7] The Company has never held annual stockholders' meetings.[8] However, since Mark took over the Company it has stopped sharing financial information with the Floreani Plaintiffs.[9]

The shares held by MMF[10] were transferred to Martin Floreani and are bound by the FloSports, Inc. Second Amended And Restated Right Of First Refusal And Co-Sale Agreement, dated May 23, 2019 (the "ROFR").[11] Christina's and Charlene's shares are not.[12] Under Section 2.1 of the ROFR, FloSports has a right of first refusal with respect to "all or any portion" of FloSports stock that is part of

---

[5] Tr. 11:8-9.

[6] *Id*. at 14-20.

[7] Tr. 22:19-24.

[8] Martin Floreani has requested a stockholders' meeting through his counsel. Tr. 231:19-24; Tr. 234:18-235:22.

[9] JX 7 at Tr. 15:7-12.

[10] MMF Family Partners, Ltd., controlled by Martin Floreani, was the record owner of the 1,600,166 shares of common stock, and on July 21, 2023, the 1,600,166 shares of common stock were transferred to Martin Floreani. D.I. 45 (Parties' Pre-trial Stipulation).

[11] JX 22.

[12] *Id*.

4

a "Proposed Key Holder Transfer," which is defined as "any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumber[ance] … ."[13]

The Floreani Plaintiffs retained Kinetic Advisors LLC ("Kinetic"), led by Mr. Sudhin Roy, as their independent investment banking firm to assist them with valuing and then financing or selling their shares in the Company.[14] Generally, Kinetic assists private companies with mergers and acquisitions, and it represents creditors with failing companies, and stockholders.[15] Kinetic was to perform an internal valuation of the Company and the shares the Plaintiffs held, then look for potential buyers for their shares.[16] Under the terms in the engagement letter between the Plaintiffs and Kinetic, Kinetic would not be paid until after the close of a defined transaction.[17]

---

[13] *Id*. at 2-3.

[14] Amend. Compl. ¶ 3; JX 24. On cross examination, Martin Floreani admitted that he engaged Kinetic for valuation in connection with a particular transfer and that Kinetic's role in the transaction was to assist in the due diligence required for the transfer. Tr. 43:1-23.

[15] Tr. 99:1-9.

[16] Tr. 102:4-9.

[17] Tr. 44:17-21; JX 24.

### B. The First Demand

On November 18, 2022 the law firm of Allen & Overy LLP ("Allen & Overy") served a written demand on FloSports, by electronic mail, requesting, pursuant to Section 220, the opportunity to inspect and copy the Company's books and records on behalf of an undisclosed "group of investors" (the "First Demand").[18] The stated purposes of the requested inspection were "ascertaining the value" of the investors' shares, "soliciting possible purchasers," and "evaluating offers to purchase" the shares.[19]

FloSports denied the request by letter dated November 28, 2022, because they believed the demand failed to satisfy the "form and manner" requirements of Section 220.[20] Specifically, FloSports noted that the First Demand (i) was not accompanied by a power of attorney, (ii) was not made "under oath," and (iii) did not provide proof of stock ownership.[21] They also noted that the First Demand did not identify the "group of investors" on whose behalf the inspection was sought.[22]

Notwithstanding the perceived defects in the First Demand, FloSports voluntarily engaged with Allen & Overy during which the Plaintiffs were disclosed

---

[18] JX 12, pg. 1.

[19] *Id.* at 2.

[20] JX 13; Def's Pre-Trial Br. at 9; *See also* 8 *Del. C.* §§ 220(b) and (c)(1)-(3).

[21] Def's Pre-Trial Br. at 9.

[22] Tr. 237:7-19.

as the group of investors behind the First Demand. At the time of the First Demand, the then-Plaintiffs collectively held 1,717,692 shares, or approximately 12.9%, of the outstanding common stock of the Company, broken down as follows: (i) MMF Family Partners, Ltd. ("MMF"), controlled by Plaintiff Martin Floreani, held 1,600,166 shares or approximately 12%; (ii) Christina Floreani held 53,090 shares or approximately 0.4%; (iii) Charlene Floreani held 46,757 shares or approximately 0.35%; and (iv) John Joseph Williamson held 17,679 shares or approximately 0.1%.[23]

In response to the First Demand, the Company provided the following books and records they felt were essential to the purpose of valuing the private stocks: Audited Financials for years 2019, 2020, and 2021; Internal 2022 Financials (audit not yet complete); 409A Valuation Reports; Debt Schedule as of December 31, 2022; Capitalization Table as of February 23, 2023; and certain forecasts of key operating results through 2025.[24]

While negotiating with the Company, Kinetic approached Second Alpha Holdings ("Second Alpha") for advice on raising capital for minority interest-holders in a private company in the late-stage venture capital space.[25] Kinetic then

---

[23] JX 38, ¶¶ 2, 10-13.

[24] Tr. 23716-239:12; Pretrial stipulation at ¶ 21.

[25] JX 9 at Tr. 24:5-25:6.

asked Second Alpha to sign onto the NDA as Second Alpha served as a special advisor to Kinetic.[26] Kinetic and Second Alpha executed the joinder to the NDA on April 13, 2023, before Kinetic shared any documents about the Company on April 18, 2023.[27] Shortly thereafter, Second Alpha informed Kinetic that they were interested in engaging in a potential transaction.[28] On April 28, 2023, Plaintiffs informed the Company that it had identified Second Alpha as a potential investor interested in engaging in a potential financing.[29] At the request of the Company's general counsel, on May 3, 2023, a teleconference was held between Kinetic, the Company, and Plaintiffs' counsel to discuss whether information from the Company could be shared with Second Alpha.[30] The call was unproductive.[31] Six weeks after the call, the Company rejected Plaintiffs' books and records request.[32] Moreover, the Company also refused to allow materials to be shared with Second Alpha.[33]

---

[26] *Id*. at Tr. 25:4-6.

[27] *Id*.; see also JX 25.

[28] *Id*. at Tr. 25:7-13.

[29] After it had shared Company information with Second Alpha. JX 9 at Tr. 25:14-17; Amend. Compl. ¶21.

[30] Amend. Compl. ¶22; Amend. Compl., Ex. E; JX 28, Ex. C ¶6.

[31] *Id*.

[32] Amend. Compl. ¶¶ 23-24; Amend. Compl., Ex. 10 F.

[33] *See* JX 7.

## C. The Second Demand

The second demand pursuant to Section 220, was dated June 20, 2023 (the "Second Demand").[34]  While several of the alleged defects in the First Demand were cured, the Company again questioned whether the Second Demand satisfied the "form and manner" requirements of Section 220 because the "under oath" affidavits attached to the Second Demand were dated June 6 and 7, 2023, but the Second Demand—executed by Plaintiffs' counsel pursuant to a power of attorney—was dated two weeks later on June 20, 2023.[35]

## D. MMF transfers its shares to Martin Floreani

Meanwhile, on May 31, 2023, Martin Floreani requested the Company approve the transfer of 1,600,166 shares in Flo Sports from his company MMF, to his own name for estate planning purposes.[36] Although Martin Floreani's shares are subject to the First Refusal Agreement, a transfer for estate planning purposes was a permitted purpose consistent with the agreement.[37]  On July 21, 2023, the Company approved the transfer of its 1,600,166 shares in FloSports to Martin Floreani. [38] The

---

[34] JX 20.

[35] *Id*.

[36] Pretrial stipulation at ¶ 21 and Pl. Pre-Trial Br. at 6-7.

[37] Pl. Pre-Trial Br. at 6-7 and 11-12.

[38] Pretrial stipulation at ¶ 21.

transfer was finalized on August 2, 2023.[39] After the Company's counsel suggested there may be a standing issue for MMF due to the transfer of the shares, on September 12, 2023, Martin Floreani sought to transfer 100,000 shares of common stock back to MMF. However, the Company did not permit the transfer citing that those shares would be subject to the First Refusal Agreement.[40]

### E. The Third Demand and Amended Complaint

On September 20, 2023, at the request of the parties[41], the Court entered an order vacating the existing case schedule and instructed the parties to work in good faith to submit an amended case schedule (the "Vacating Order").[42] On September 27, 2023, Plaintiffs served an "Amended Renewed Demand" (the "Third Demand") on the Company.[43] That same day, Plaintiffs filed their motion to amend the complaint to add Martin Floreani as a plaintiff, in lieu of MMF, and also dismiss John Joseph Williams as a plaintiff.[44] Plaintiffs' motion to amend the complaint acknowledged that the Third Demand was served on the Company that day, but explained that Plaintiffs did not intend to serve the proposed amended complaint on

---

[39] Pl. Pre-Trial Br. at 12.

[40] *Id.*

[41] D.I. 24.

[42] D.I. 25.

[43] Pretrial stipulation at ¶ 26.

[44] *Id.*

the Company until after the five (5) business days have lapsed.[45] Thus, I granted the leave to amend.[46]

At the teleconference held on October 6, 2023, the Company challenged this court's jurisdiction regarding the Third Demand, stating that the Court lacked jurisdiction over the Third Demand because of the required 5-day lapse time.[47] Because the parties had previously agreed to the share transfer between MMF and Martin Floreani who was at all times a record owner of the Company and Plaintiff in this action, the Plaintiffs consented to waiting the five days to serve the amended complaint, and did so. The parties also stipulated to an amended case schedule, which I granted on October 13, 2023[48], after the Plaintiffs filed their amended

---

[45] D.I. 26, pgs. 2-3.

[46] D.I. 28.

[47] D.I. 33.

[48] D.I. 36.

complaint on October 10, 2023.[49]  On November 8, 2023, this matter proceeded to

trial.[50]

## III.   ANALYSIS

"To inspect books and records under Section 220, a plaintiff must establish

by a preponderance of the evidence that the plaintiff is a stockholder, has complied

with the statutory form and manner requirements for making a demand, and has a

proper purpose for conducting the inspection."[51]  "If a stockholder meets these

requirements, the stockholder must then establish that each category of the books

---

[49] D.I. 35; the Company still maintains their challenge to the validity of the Amended Complaint and Third Demand, D. I. 39, however it seems the parties have been partaking in a bit of gamesmanship that, in the interest of justice, should not prevent this case from moving forward.  Prior to Plaintiffs filing this action, the Company hadn't approved Martin Floreanni's request to transfer his shares he made on May 31, 2023.  The Company waited until after this action was filed. D. I. 41 (Tr. 16:1-15).  After this 220 action was filed, the Company changed positions and agreed to effectuate the transfer, D.I.41 (Tr. 16:14-19, telephonic Status Conference)—seemingly to later challenge standing, as mentioned during the heated phone conversation between the parties during discovery. *Id*. After the transfer, the Plaintiffs needed to name Martin Floreani personally, from the company MMF-the family company always owned by Martin Floreani and his wife.  When Plaintiffs filed leave to Amend on September 27th, the Company remained silent for nearly a week in this summary proceeding, until after I granted the motion, raising the jurisdiction issue only on October 4th (D. I. 29) when they were already aware of the third demand.  Despite this defect, once the issue had been cleared and the parties updated, I maintained the very strict 5-day waiting requirement under Delaware law.

[50] D. I. 54.

[51] *Pettry v. Gilead Scis., Inc*., 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), judgment entered, (Del. Ch. 2020).

and records requested is essential and sufficient to the stockholder's stated purpose."[52]

The parties agree that the Plaintiffs are stockholders but they disagree as to whether the Plaintiffs' third demand satisfies the statutory prerequisites and requirements of Section 220.[53] If so, the parties agree that the Plaintiffs have stated a proper purpose for inspection but ask the Court to determine if the purpose is pretextual and if not, which documents are necessary and essential for the stated purpose of valuing their shares.

### A. The Third Demand Satisfies Section 220

"Delaware courts require strict adherence to the Section 220 inspection demand procedural requirements."[54]

Section 220(c) provides:

> If the corporation, or an officer or agent thereof, refuses to permit an inspection sought by a stockholder or attorney or other agent acting for the stockholder pursuant to subsection (b) of this section or does not reply to the demand within 5 business days after the demand has been made, the stockholder may apply to the Court of Chancery for an order to compel such inspection.[55]

---

[52] *Id.*

[53] D. I. 45 (Pretrial stipulation at ¶¶ 32-35).

[54] *MaD Investors GRMD, LLC v. GR Companies, Inc.*, 2020 WL 6306028, at *2 (Del. Ch. Oct. 28, 2020) (quoting *Katz v. Visionsense Corp.*, 2018 WL 3953765, at *2 (Del. Ch. Aug. 16, 2018)).

[55] 8 *Del. C.* § 220(c).

Flosports argues that Plaintiff's Third Demand fails to state a claim because the Court granted Plaintiff's motion to amend their complaint.[56] They argue that the Court lacked jurisdiction when it granted leave for Plaintiffs' to amend their Complaint. Defendant is correct that Section 220 requires five (5) days to allow response to a proper Demand, however, this Court still maintained jurisdiction over the Plaintiffs originally filed complaint related to the Second Demand. Plaintiffs filed for leave to amend on September 27, 2023. The motion went unopposed[57] until October 4th after leave was granted.[58] Additionally, the September 6th letter to the Court from both parties indicated that substantial settlement negotiations had begun, and the parties requested to extend their briefing schedule to accommodate the discussions[59]. A few weeks later, on the 19th of September, the parties requested to vacate the schedule all together.[60] At the conference call on October 6th, addressing the jurisdiction issue, the parties revealed the arguing between the parties and the transfer of shares between Plaintiff's company, MMF, and Plaintiff Martin

---

[56] Pl. Pre-Trial Br. at 34.

[57] The Plaintiffs' motion included a footnote indicating that Defendant opposed the relief requested, however this Court interpreted the footnote to mean the Defendant opposed the relief requested in the Third Demand, not the filing of the motion to amend the complaint. Defendant later clarified during a teleconference that it opposed the motion to amend.

[58] D. I. 30.

[59] D. I. 22.

[60] D. I. 24.

Floreani.[61] At that time, Plaintiffs made it clear that they would file the amended complaint on a date certain (October 10th) which happened to be after the statutory five days and ultimately cure any potential jurisdictional defect because it provided the requisite time period for the Company to respond to the Third Demand.[62] And Plaintiffs did wait the five days after submitting a new demand on Defendant.[63] To be clear, Plaintiffs did not need or attempt to seek permission from the Court to file a new demand, Plaintiff's merely asked the Court for permission to make changes to the current complaint.[64]

It appeared to me that the parties had agreed to amend their demand to accommodate the transfer of stock from MMF to Martin Floreani but, when

---

[61] D.I. 33.

[62] D.I. 29.

[63] D.I. 29 (The Third Demand was not served on FloSports until September 27, 2023, the same day Plaintiffs filed their Motion to add it to this case).

[64] Defendant cites *MaD Investors GRMD, LLC v. GR Companies, Inc.*, where Vice Chancellor Zurn held: "'This Court has enforced the statutory response period strictly and dismissed prematurely filed complaints.' 'The obligation to wait out the response period is jurisdictional.'" 2020 WL 6306028, at *2 (Del. Ch. Oct. 28, 2020) (quoting *Katz v. Visionsense Corp.*, 2018 WL 3953765, at *2 (Del. Ch. Aug. 16, 2018)). In *MaD Investors*, the plaintiffs filed their 220 complaint the evening before the statutory 5- day period lapsed, and the Court dismissed the complaint with prejudice. But here, Plaintiffs did not file a complaint. They requested leave to amend their complaint. The Court agrees that, like in *MaD Investors*, jurisdiction is not suddenly restored once the 5-day period passes, in fact the VC Zurn held that "Plaintiffs' failure to comply with Section 220(c)'s five-day response period deprives this Court of jurisdiction over Plaintiffs' Complaint and request to supplement it." *Id*. at *6.

15

discussions deteriorated, the Defendant Company took issue with that plan.[65]

Delaware law is clear that "hypertechnical defenses" are impermissible unless discovered in good faith.[66] Because the Court still maintained jurisdiction over the second demand and the other Plaintiffs; Plaintiffs filed the Amended Complaint on October 10th, curing any potential jurisdictional question; and for the reasons stated in the October 6th conference call with the Court, the Court finds the Third Demand satisfies the form and manner requirements under Section 220.

## B.     Plaintiffs Have a Proper Purpose for Inspection

A stockholder's purpose is the "paramount" factor in determining whether a stockholder is entitled to inspection.[67]   Section 220(b) defines "proper purpose" as "a purpose reasonably related to such person's interest as a stockholder."[68]  Plaintiffs seek inspection to value their stock of a closely held company.[69]  The parties agree, and Delaware law confirms,  that valuation of ones shares is a proper purpose under

---

[65] *See* D. I. 24 (Stipulated & Proposed Order Vacating Deadlines in Order Governing Case Schedule).

[66] *Mattes v. Checkers Drive-In Rests., Inc.*, C.A. No. 17775, slip op. at 2 (Del. Ch. Nov. 15, 2000) (denying late assertions of technical defenses unless the defendant in could not, in good faith, have asserted them earlier).

[67] *CM&M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[68] Def.'s Pre-Tr. Br. at 48.

[69] D.I. 35, Exhibit A (the Demand).

Section 220 to inspect books and records.[70] FloSports raises a technical issue with Plaintiffs' purpose because the Plaintiff's entered into an Agreement among themselves and a former party, MMF.[71] The "Common Interest Agreement" is an agreement between the parties and former party, MMF Partners—a company operated by Martin Floreani.[72] The agreement gives MMF the right to initiate litigation on behalf of the collective—the parties to the agreement—to MMF.[73] The Defendant suggests that this agreement robs the Plaintiffs of a proper purpose and standing because MMF no longer holds any shares of the Company, those shares were reassigned to Martin Floreani, and MMF was removed as Plaintiff in the Amended Complaint.[74] I don't see how that agreement, which isn't alleged to include the Company, has any implications for this litigation. It also robs the valid stockholders of their statutory right to seek inspection. Here, the Plaintiff stockholders have stated a proper purpose reasonably related to their interests as

---

[70] The Court of Chancery "has recognized on several occasions that because of the absence of a publicly traded market, a shareholder in a closely held corporation has no ability to value his or her shares, yet would need to make an initial valuation, if only to determine whether the shares are marketable, and if so, at what price." *Woods Tr. of Avery L. Woods Tr. v. Sahara Enterprises, Inc.*, 238 A.3d 879, 890 (Del. Ch. 2020), *judgment entered sub nom. In re Woods v. Sahara Enterprises, Inc.* (Del. Ch. 2020) (quoting *Thomas & Betts*, 685 A.2d at 713).

[71] Def.'s Pre-Tr. Br. at 10.

[72] D.I. 45 at 43 (Parties' Pre-trial stipulation).

[73] *Id*.

[74] *Id*.; Def.'s Pre-Tr. Br. at 10. Further, Plaintiffs did not furnish the agreement until late into discovery, to which the Company also takes issue.

stockholders. There was credible testimony that Plaintiffs seek books and records to value their shares, for an eventual sale of their shares, which is a proper purpose under Delaware law.[75]

### C. Plaintiffs' Stated Purposes Are Not Pretextual or Proven to be Adverse to the Company's Interest

FloSports also argues that Plaintiffs' stated purposes are "personal and adverse to the "interests "of the company's stockholders."[76] To the extent, this is the Company's effort to argue the Plaintiffs' purpose is pretextual, such a showing was not made here.

"[O]nce a stockholder has identified a proper purpose . . . the burden shifts to the corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper."[77] "[O]ur courts have given credence to such defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a stockholder."[78] "'Such a showing is fact

---

[75] *Macklowe v. Planet Hollywood, Inc.,* 1994 WL 560804, at *4 (Del. Ch. Sept. 29, 1994) (citing *CM & M Gp*., 453 A.2d at 792-93; *Radwick Pty., Ltd. v. Med., Inc.,* 1984 WL 8264 (Del. Ch. Nov. 7, 1984)).

[76] Def's Pre-Trial Br. at 53.

[77] *Woods*, 238 A.3d at 891.

[78] *Sutherland v. Dardanelle Timber Co.,* 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006).

intensive and difficult to establish.'"[79]  Here, I find that FloSports has not met its burden to prove that the Plaintiffs' purpose is to gain a competitive edge or cause reputational harm, rather than the stated purpose of valuing their shares.  It is clear that there is personal animosity between the parties, however the record does not show that the demands were sent because of this personal animosity, but rather reflects the books and records demands were sent to the Company for the stated purpose of valuing their shares.

FloSports also maintains that the Plaintiffs, or at least Martin Floreani, are competitors and are seeking the inspection with the plan to share the information with non-stockholders.[80]  They suggest that Plaintiffs already breached a prior confidentiality agreement by sharing information with a prospective purchaser, Second Alpha.[81]  While FloSports maintains that the information sought is confidential, it fails to identify any injury it sustained from the alleged breach even though it suggests potential injury is because it is attempting to raise capital at the same time Plaintiffs seek to liquidate its shares.[82]

---

[79] *Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.,* 2019 WL 479082, at *9 (Del. Ch. Jan. 25, 2019) (quoting *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007)), *aff'd,* 237 A.3d 818 (Del. 2020).

[80] Def.'s Pre-Tr. Br. at 48.

[81] Def.'s Pre-Tr. Br. at 49.

[82] Tr. 203:10-204:17.

With respect to the competition argument, Delaware law dictates that whether the Plaintiffs are competitors or are in control of a competing company is not a defense to an otherwise proper demand.[83] Similarly, if there is no risk of competition or injury, stockholders who seek information under section 220 for the purpose of selling their stock are allowed to share the information they obtain with prospective purchasers.[84] Here, I am satisfied that neither the stockholders or Martin Floreani's company Rofkin, is in direct competition with FloSports.[85] Additionally, the

---

[83] *Kortum v. Webasto Sunroofs, Inc.,* 769 A.2d 113, 124 (Del. Ch. 2000)("A stockholder's status as a competitor may limit the scope of, or require imposing conditions upon, inspection relief, but that status does not defeat the shareholder's legal entitlement to relief."); *Gen. Time Corp. v. Talley Indus., Inc.*, 240 A.2d 755, 756 (Del. 1968) ; E.L. Bruce Co. v. State *ex rel.* Gilbert,144 A.2d 533, 534 (Del. 1958) ; *SafeCard Servs., Inc. v. Credit Card Serv. Corp.*, C.A. No. 6426, slip op. at 7 (Del. Ch. Sept. 5, 1984); *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 211-212 (Del. Ch. 1976). However, inspection of books and records has been denied where the plaintiff was likely to disclose information to the defendant's competitors, disclosure of such information would injure the defendant, and the plaintiff had already received sufficient information to reasonably enable him to establish a value for his stock. *See, e.g.*, *Eastlund v. Fusion Sys.*, C.A. No. 11574, slip op. at 6-8 (Del. Ch. Aug. 29, 1990) (finding that plaintiff would disclose information to competitors, injuring defendant, and noting that plaintiff had been offered opportunity to inspect additional documents upon signing confidentiality agreement)

[84] *Schoon v. Troy Corp.,* 2006 WL 1851481, at *1 (Del. Ch. June 27, 2006), *clarified on denial of reargument,* 2006 WL 2162036 (Del. Ch. July 24, 2006) (permitting the stockholder to disclose confidential information to identified purchasers but conditioned the disclosure on a valid confidentiality agreement with a five-business day advance notice provision).

[85] At trial, Mr. Martin Floreani credibly testified that Rofkin is not a direct competitor of the Company and described its relationship in the shared industry as follows: "The analogy I give is we're a supermarket. We sell beef. FloSports is McDonald's. There may be sometimes where a customer is shared between McDonald's and a supermarket, but they're not competitors. And it's really two different experiences. If you want to go out and grow your -- grill a hamburger and make it yourself, and – you would go to a supermarket and buy that beef. But if you're just looking for a quick -- if you want an all-encompassing

20

information they wish to share to *nonstockholders* is to an identified purchaser. All of which are willing to be bound by a reasonable confidentiality agreement.[86] Flosports asserts but has not sufficiently demonstrated (and I will address this below), that a confidentiality agreement would not protect their interests without strict terms and conditions, along with substantial penalties.[87]

### D.    Scope of Production - The Necessary and Essential Documents

Where a stockholder plaintiff establishes a proper purpose for inspecting books and records under Section 220, the Court must evaluate the scope of the request. "The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it."[88]

The stockholder plaintiff "'bears the burden of proving that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection.'"[89] "Books and records satisfy this standard 'if they

---

solution for your live rights, you're going to go to FloSports. FloSports helps with the production, they -- they execute with the marketing. It's a full-service execution, in terms of what they do with live rights. Live rights, if a creator posts live rights on our platform, what they're doing it on their own basis. It's kind of like more like YouTube." Tr. 17:5-24.

[86] In FloSport's briefing they identify that Plaintiffs executed a confidentiality agreement prior to disclosing any information to their valuation professionals at Kinetic and anyone at Second Alpha. Def.'s Pre-Tr. Br. at 56.

[87] Def's Pre-Trial Br. at 55-58.

[88] *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *8 (Del. Ch. Aug. 31, 2022).

[89] *KT4 Partners LLC v. Palantir Techs. Inc.,* 203 A.3d 738, 751 (Del. 2019).

address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[90]  Section 220 inspections must be tailored to permit inspection of only those "books and records that are 'essential and sufficient to the stockholder's stated purpose.' Therefore, the Court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'"[91]

In determining which documents are necessary and essential to accomplish a proper purpose, recent decisions have grouped requests for books and records into three categories:

> • "Formal Board Materials," or "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered;"
> • "Informal Board Materials," which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings," and sometimes including "emails and other types of communication sent among the directors themselves;" and
> • "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."[92]

---

[90] *Id*.

[91] *Id.* at 751-52.

[92] *Hightower*, 2022 WL 3970155, at *9 (quoting *Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp*, 2020 WL 132752, at *25 (Del. Ch. Jan. 13, 2020) aff'd, 243 A.3d 417 (Del. 2020)).

Formal Board Materials are the starting point—and typically the ending point—for a sufficient inspection.[93] "In many organizations, the corporate secretary maintains a central file for each board meeting in either paper or electronic form that contains the minutes and other Formal Board Materials for that meeting."[94] "[A]n inspection may then extend to informal materials depending on "the context in which the shareholder's inspection demand arises."[95]

Where a stockholder seeks to value her shares, "the invariable starting point is financial statements—both audited and unaudited and both annual and quarterly."[96] At times, a stockholder may show a need to look at more sensitive information.[97] This information may increase in sensitivity from key contracts, entries from the general ledger, or accounting work papers, to tax returns or forecasts and projections.[98] "As the documents become more granular and sensitive, the likely case for a confidentiality restriction grows."

---

[93] *Woods*, 238 A.3d at 897.

[94] *Id.*

[95] *Id.*

[96] *Rivest v. Hauppauge Digital, Inc.*, 2022 WL 3973101, at *20 (Del. Ch. Sept. 1, 2022), *appeal refused*, 285 A.3d 460 (Del. 2022), and *judgment entered*, (Del. Ch. 2022), *aff'd,* 300 A.3d 1270 (Del. 2023), and *aff'd,* 300 A.3d 1270 (Del. 2023)

[97] *Id.*

[98] *Id.*

Plaintiffs June 20, 2023, Demand requests fourteen (14) sets of documents as

follows:

a) All of the Company's annual financial statements including all statements of cash flows, statements of income, statements of expenses, statements of capital expenditures, balance sheets, and any commentary, limitations, or qualifications to such statements from 2018 through the present.

b) Updates, periodic financial statements, or draft financial statements from 2018 through the present.

c) The most recent budget reflecting the Company's current costs and projections.

d) All of the Company's tax returns for the years 2018 through the present, and documents sufficient to show how the tax returns for these years tie to the Company's general ledger and financial statements.

e) All work papers created, used, or relied upon by the Company's accountants in preparing the Company's tax returns for the year 2018 through the present.

f) All of the Company's charters, amended charters, amended and restated voting agreements, rights of first refusal, amended rights of first refusal, amended and restated rights of first refusal, and all exhibits thereto.

g) Materials relating to, referring to, or constituting any proposal to purchase the Company's stock or to engage in any strategic transaction, including but not limited to any proposed "de-SPAC transaction", whether such proposals were made by or directed to the Company.

h) Any valuation of the Company's stock and/or assets as of any time from 2018 to the present, including without limitation any valuation performed in connection with any proposed de-SPAC transaction.

i) Materials relating or referring to any transactions involving the Company's stock, whether or not the Company was a party to such transaction.

j) A complete record or list of the Company's stockholders, certified by its corporate secretary or transfer agent, showing for each stockholder, without

24

limitation, the name, address, and number and type of shares owned

k) Transfer sheets and/or other materials that refer to or reflect transfers of the Company's stock made subsequent to the date of the list of stockholders in response to paragraph 11.

l) All loan agreements, loan documents and payment schedules relating to any loans made to the Company including the loans identified in the schedule previously provided by the Company.[99]

Here, the Floreanti Plaintiffs are seeking to value their shares of a closely held, private corporation. They seek financial statements for mostly closed periods, limited contracts, tax information, stock transfer information, and a list of stockholders. They justify their request of more granular sets of productions to properly value the company and, as such, their shares.

In terms of the scope of production, the Company asserts that they have given the Plaintiffs the essential documents for valuation.[100] FloSports produced the following documents, concluding they are the only essential documents related to the Plaintiffs' stated purpose of valuing their shares: (i) audited financials for 2019, 2020, 2021; (ii) unaudited financials for 2022 (audit not complete as of production); (iii) several 409A valuation reports; (iv) debt schedule as of December 31, 2022; (v) capitalization table as of February 23, 2023; and (vi) forecasts of key operations

---

[99] D.I.35 (Ex.A).

[100] D.I. 45.

through 2025.[101] The Company asserts that this production was not enough under the advice of Roy, through Kinetic.[102] He suggests that the production given to them was deficient and out of date for their needs.[103] I consider those arguments as it relates to the following documents:

As to document sets (a), (b), and (c) (to the extent it's not duplicative of the other sets) above, the Plaintiffs have shown that those documents are essential to value their shares. The Company should give those documents remaining in the set to complete production.

As to document set (d) above, I agree with the production of the tax documents, but I find that "documents sufficient to show how the tax returns for these years tie to the Company's general ledger and financial statements" is an overreach and extends beyond the limits of essential documents, considering the full production. Accordingly, I will not require the Company to produce those documents.

As to document set (e), similarly, I find this set is overreaching and exceeds the bounds of what is necessary and essential for valuation. Accordingly, I will not order production of set (e).

---

[101] JX 35; Def's Pre-Trial Br. at 13.

[102] *Id.*

[103] Tr. 112:17-114:13.

As to document sets (f), (g), (h), (i), (j), (k), and (l), the Plaintiffs have met their burden that these categories of books and records are necessary and essential to value their shares, and the Company should produce these documents.

E.     **Confidentiality Agreement**

An overarching debate in this Section 220 case is that FloSports claims that Martin Floreani's company, Rofkin is a competitor of the Company. It has concerns that he wants to use the requested information for his own purposes—potentially adverse to the Company's interest and funding efforts. The other concern is that the Plaintiffs plan to "use" the information by disclosing it to "nonstockholders", i.e. potential buyers.[104] Further, the Company claims that a confidentiality agreement would not sufficiently protect the Company's information because Martin Floreani already breached an earlier agreement by giving information to Second Alpha without prior approval and that disclosing information to potential buyers could harm the Company as in its next round of funding efforts.[105]

In the instant case, where the Company is ordered to produce the requested documents, the Company requests that the Court impose a strict confidentiality agreement. It suggests that I "impose a 10-day prior written notice requirement, full disclosure of the bona fide purchaser, consent by FloSports via a written agreement

---

[104] Def. Pre-Trial Br. at 48.

[105] *Id.* at 46-67.

27

with the purchaser, consent to jurisdiction in Delaware, and a liquidated damages plus attorneys' fees clause for any breach."[106]

Plaintiffs have maintained that their purpose is proper, and they assert a willingness to be bound by a confidentiality agreement. Plaintiffs suggest an agreement which restricts Martin Floreani's access to the confidential information to mitigate the Company's perceived risk.[107] They note that the Company has not identified any information that is actually confidential, insisting that the majority of this information would be publicly available if the company was a public company and held to public reporting standards.[108] Importantly, Plaintiffs gloss over the fact that it disclosed information to Second Alpha after obtaining its own confidentiality agreement with them, but prior to disclosing the information to the Company.[109]

I do find a confidentiality agreement is warranted here. With respect to the terms of the confidentiality agreement, I draw my conclusions from *Schoon v. Troy Corp*. There, this Court was tasked with deciding on a fair confidentiality agreement in a similarly situated books and records case. In *Schoon*, the defendant company was a privately held Delaware corporation.[110] The stockholder plaintiff planned to

---

[106] *Id.* at 58.

[107] Pl. Pre-trial Br. at 24.

[108] *Id.*

[109] Pl. Pre-trial Br. at 32; JX 9 at Tr. 14:18-16:10; JX 25.

[110] *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1.

use the defendant company's books and records to seek a buyer for its shares.   The company was concerned about the disclosure of its information because among those most likely to be potential buyers of the plaintiff's shares were its "principal competitors."  The parties had previously entered into an agreement which prevented the plaintiff from sharing any of the company's information with third parties without the company's consent.[111]  Aside from the fact that the company asserted that the agreement governed the plaintiff's statutory right to books and records, it also wanted to impose similar restrictions in the confidentiality agreement which would govern the production of records.  To that end, the Court found that such an agreement was "unreasonable" and would not impose such restrictions even when the potential purchasers would be "principal competitors" of the company.[112]  The Court did, however, proscribe necessary conditions for a confidentiality agreement. Their limitations were aimed to protect both the company's proprietary information (deeming its concerns legitimate regarding their exposure) and balance the plaintiff's statutory rights since the plaintiff had a proper purpose to "inspect [Troy's corporate records] . . . to value its shares and to negotiate the sale of its stock to a third party."

---

[111] *Schoon v. Troy Corp.*, 2006 WL 1851481, at *2.

[112] *Id*. at *5 ("Moreover, Troy's absolute restriction on the ability of a Level Two Competitor's financial advisor to disclose any information to the Level Two Competitor is unreasonable").

Relevant here, based on the information involved in this request, were the steps the parties negotiated to keeping certain information private. First, the plaintiff had the power to "disclose basic information to all third-party prospective purchasers if such parties execute confidentiality agreements."[113] For competitors who required more than basic information, the Court further required:

> • Five business days' notice prior to disclosing *any* of the company's information to a third-party bona fide prospective purchaser or its representative;
> • Certification in writing that the third party made a written representation that it was a bona fide prospective purchaser of plaintiff's shares of the company's stock; identify the name and address of such prospective purchaser and whether the third-party was a competitor;
> • Identify the name and address of such prospective purchaser and whether the third-party was a competitor;
> • Inform the company in writing of the date that the plaintiff will disclose the information to the prospective purchaser; and
> • Provide the company with the prospective purchaser's fully executed confidentiality agreement. [114]

Both parties agree that a confidentiality agreement should be put in place, and I agree, given the Company's concerns as noted above. The parties shall meet and confer on the terms of a confidentiality order. The scope of that confidentiality order must include the following:

---

[113] *Id.*

[114] *Id.* "[plaintiff] shall (1) notify [the company] in writing that [plaintiff] intend[ed] to disclose the information to a third party."

30

1. Five business days' notice prior to disclosing *any* of the company's information to a third-party bona fide prospective purchaser or its representative with the name and address of such prospective purchaser. During this time the parties can determine whether the purchaser is a competitor;

2. A certification in writing that the third party made a written representation that it was a bona fide prospective purchase of Plaintiffs shares; and

3. Provide the company with the prospective purchaser's fully executed confidentially agreement.

## IV.   CONCLUSION

For the foregoing reasons, I find judgment should be entered in favor of the Plaintiffs as described above. The parties should meet and confer regarding a form of order memorializing the scope of the production. With judgment in Plaintiffs favor, I also recommend the Company's request for fee shifting to be denied. This is my final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2). The stay of exceptions entered under the Chancellor's July 11, 2023, letter is hereby lifted.